UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

523 IP LLC,
　　　an Illinois corporation,

　　　　　　　　　　Plaintiff,

*v.*

CureMD.Com, Inc.
　　　a New York corporation,

　　　　　　　　　　Defendant.

Case No. 11 Civ. 9697 (KPF)

LOCAL RULE 56.1 STATEMENT OF UNDISPUTED MATERIAL
FACTS IN SUPPORT OF DEFENDANT CUREMD.COM, INC.'S
<u>MOTION FOR SUMMARY JUDGMENT</u>

Index to Exhibits to Defendant CureMD's Statement of Undisputed Material Facts

| Exhibit No. | Description |
|:---:|:---|
| A | U.S. Patent No. 7,072,523 |
| B | '523 Prosecution File History Decision on Appeal, October 30, 2009 |
| C | '523 Prosecution File History Amendment, August 8, 2006 |
| D | '523 Prosecution File History Office Action, February 7, 2008 |
| E | '523 Prosecution File History Appellant's Appeal Brief, March 24, 2008 |
| F | '523 Prosecution File History Examiner's Answer to Appeal Brief, June 24, 2008 |
| G | '523 Prosecution File History Applicant's Response to Examiner's Answer, August 25, 2008 |
| H | '523 Prosecution File History Record of Oral Hearing Before BPAI, October 20, 2009 |
| I | '523 Prosecution File History Notice of Allowance, January 11, 2010 |
| J | Kamal Hashmat Deposition |
| K | Kamal Hashmat Deposition |
| L | Kamal Hashmat Deposition |
| M | Kamal Hashmat Deposition |
| O | Kamal Hashmat Deposition |

Index to Exhibits to Defendant CureMD's Statement of Undisputed Material Facts

| Exhibit No. | Description |
|:---:|:---|
| P | Kamal Hashmat Deposition |
| Q | Kamal Hashmat Deposition |
| R | Kamal Hashmat Deposition |
| S | Kamal Hashmat Deposition |
| T | Kamal Hashmat Deposition |
| U | Kamal Hashmat Deposition |
| V | Kamal Hashmat Deposition |
| W | Kamal Hashmat Deposition |
| X | Kamal Hashmat Deposition |
| Y | Kamal Hashmat Deposition |
| Z | Kamal Hashmat Deposition |

Defendant, CureMD.com, Inc. ("CureMD") submits the following statement of material undisputed facts ("SMF") pursuant to Local Rule 56.1.  These facts demonstrate that there is no material issue for trial, and CureMD is entitled to summary judgment that asserted Claim 31 of U.S. Patent No. 7,702,523 ("the '523 patent") is not infringed and invalid.

**523 IP's Allegation of Infringement of the '523 Patent**

1. On December 30, 2011, 523 IP LLC ("523 IP") filed a patent infringement action against CureMD for infringement of U.S. Patent No. 7,702,523 ("the 523 patent").  (Doc. No. 1)

2.  On June 21, 2012 523 IP filed an amended complaint against CureMD for infringement of the '523 patent. (Doc. No. 10)

3.  On August 2, 2012 CureMD filed an answer to the amended complaint denying the allegation of infringement and asserted affirmative defenses including non-infringement and invalidity of the '523 patent.  (Doc. No. 15)

4.  The '523 patent includes 35 claims in which claims 1, 16, and 31 are independent claims.  (Ex. A)

5.  Claim 31 of the '523 patent is the only claim 523 IP asserts is being infringed by CureMD.  (Doc. No. 10)

6.  523 IP alleges that CureMD's Patient Portal product infringes claim 31 of the '523 patent, and no other product of CureMD is alleged to infringe the '523 patent.  (Doc. No. 10)

7.  Attached to the amended complaint is a claim chart ("523 IP claim chart") that identifies CureMD's Patient Portal product as the infringing product.  (Doc. No. 10)

8.  In a letter dated April 6, 2011 addressed to Fraz Wahlah at  CureMD, counsel for 523 IP alleged that CureMD is using the patented technology of the '523 patent in the CureMD Patent Portal.  (Hashmat Dec. ¶5)

9.  The April 6, 2011 letter to Fraz Wahlah included a preliminary claim chart applying claim 31 to the elements of the Patient Portal product.  (Hashmat Decl. ¶5)

10.  In response to the April 6, 2011 letter from 523 IP's counsel, Bilal Hashmat of CureMD forwarded a response on July 12, 2011 to 523 IP's counsel denying the allegation of infringement and identifying the features of claim 31 that are not present on the Patient Portal product.  (Hashmat Decl. ¶6)

11.  Mr. Hashmat in his July 12, 2011 correspondence to 523 IP's counsel asserted that the Patient Portal product does not engage in any form of routing and all information is stored in a single database regardless of the content of the message thereby eliminating the need for any routing requirement.  (Hashmat Decl. ¶8)

12.  In a letter dated August 26, 2011 523 IP's counsel requested that CureMD provide supporting documentation describing the details of the CureMD system and explained why the CureMD system cannot infringe the '523 patent.  (Hashmat Decl. ¶10)

13.  On November 3, 2011 523 IP's counsel forwarded a draft of a complaint (without exhibits) to CureMD, alleging infringement of the '523 patent by CureMD and demanding copies of materials on all instruction and installation materials and provide access to an installation to enable 523 IP to examine the Patient Portal product.  (Hashmat Decl. ¶¶11, 12)

**CureMD's Assertion of Non-Infringement of the '523 Patent**

14.   In response to the 523 IP claim chart for claim 31, Bill Hashmat prepared and forwarded to 523 IP a claim chart, explaining why the Patient Portal features shown in the 523 IP claim chart are not present on the Patient Portal product.  (Hashmat Decl. ¶15)

15.   In the 523 IP claim chart the screen shot for element 1 of claim 31, routing a message, does not support 523 IP's conclusion that messages are routed from a requestor to a physician with Patient Portal.  (Hashmat Decl. ¶16)

16.   With the Patient Portal product all messages from patients are stored in the same unified database system and the messages are not automatically routed based on content or routing criteria.  (Hashmat Decl. ¶16)

17.   The screen shots for elements nos. 2 and 3 in the 523 IP claim chart do not show a plurality of message destinations for the Patient Portal product.  (Hashmat Decl. ¶17)

18.   The patient selects from a list of users where the message is to be sent for Patient Portal.  (Hashmat Decl. ¶17)

19.   For Patient Portal only the user name is disclosed, there is no email address or office address and no criteria for routing the message.  (Hashmat Decl. ¶17)

20.   With Patient Portal, the patient selects a user from a list of users and the message is saved in the database for the user to whom it is addressed.  (Hashmat Decl. ¶17)

21.   With Patient Portal, there is no criterion, logic or algorithm for content processing. (Hashmat Decl. ¶17)

22.   The screen shots relied upon by 523 IP to support the presence of elements nos. 4 and 5 of claim 31 directed to downloading a form from a website do not disclose a downloadable form.  (Hashmat Decl. ¶18)

23.   With the Patient Portal, the user does not download forms from the website for entering a message. (Hashmat Decl. ¶18)

24.   The screen shots shown in the 523 IP claim chart by elements 4 and 5 illustrate a conventional web page which is completed and saved by the patient in the database. (Hashmat Decl. ¶18)

25.   The screen shot relied upon by 523 IP to prove the presence of claim 31 element no. 6, determining an information content of the message and matching the routing criteria, on Patient Portal was taken from a CureMD demonstration.  (Hashmat Decl. ¶19)

26.   Patient Portal does not include a content processor for determining the content of the message and then matching the routing criteria of the message with the destination.  (Hashmat Decl. ¶19)

27.   The Patient Portal product shown in the demonstration screen shot does not include a content processor for determining the content of the message and then matching the routing criteria of the message with a message destination.  (Hashmat Decl. ¶19)

28.   The screen shots relied upon by 523 IP to prove the presence of claim 31 element 7, routing the message to the selected message destination based on the information content and routing criteria, were also taken from a CureMD demonstration.  (Hashmat Decl. ¶20)

29.   The screen shots relied upon by 523 IP to prove the presence of claim 31 element no. 7 illustrates operation of Patient Portal where information is sent by the user to a unified database where it is available to be viewed by authorized users without requiring any routing or distribution.  (Hashmat Decl. ¶21)

30.  In responding to 523 IP's claim chart, Mr. Hashmat explained that Patient Portal is merely another component of the EMR system where all messages are saved in one database. (Hashmat Decl. ¶22)

31.  In addition to informing 523 IP's counsel why the Patient Portal product does not infringe claim 31, Mr. Hashmat authored a document entitled "CureMD Application Workflow" which he forwarded to counsel for 523 IP, in further explanation and evidence why the Patient Portal does not infringe claim 31.  (Hashmat Decl. ¶23)

32.  Paragraph (a) of the Application Workflow provides a screen shot of the login for Patient Portal, demonstrating how a user accesses their medical records through the unified database.  (Hashmat Decl. ¶24)

33.  Paragraph (b) of the Application Workflow demonstrates a screen shot showing how patients log in to Patient Portal using a surname provided by the practice.  (Hashmat Decl. ¶25)

34.  Paragraph (c) of the Application Workflow provides a screen shot illustrating how the patient selects a user from a list of users to retrieve a message from the unified database. (Hashmat Decl. ¶26)

35.  Paragraph (d) of the Application Workflow illustrates how the patient composes a message on a form addressed to a practice user.  (Hashmat Decl. ¶27)

36.  Paragraph (e) of the Application Workflow includes a screen shot illustrating how a practice user can view the message sent by the patient to the designated user.  (Hashmat Decl. ¶28)

37.  Paragraph (f) of the Application Workflow includes a screen shot demonstrating how the patient can review a message from the user by accessing the unified database.  (Hashmat Decl. ¶29)

38.   Paragraph (h) of the Application Workflow includes a screen shot demonstrating how the messages between the patient and user are saved in the patient's chart in the unified database. (Hashmat Decl. ¶30)

39.   The screen shots and explanations provided in the Application Workflow prepared by Mr. Hashmat illustrate that the Patient Portal product does not include a plurality of message destinations provided by the physician, criteria for routing messages provided by the physician, a form downloaded from the web site for composing the message and returning it to the web site, a content processor, or a routing processor. (Hashmat Decl. ¶31)

40.   Mr. Hashmat prepared a Patient Portal Workflow chart to further demonstrate the operation of Patient Portal and how it differs from the method and apparatus for routing a message from a requestor to a physician.  (Hashmat Decl. ¶33)

41.   The Patient Portal Workflow chart is representative of the initial Patient Portal product that Mr. Hashmat helped develop in 2000 and is offered today by CureMD.  (Hashmat Decl. ¶34)

42.   As illustrated in the Patient Portal Workflow chart, the patient logs in to obtain access to a home page where he selects the desired module from the available modules. (Hashmat Decl. ¶35)

43.   The Patient Portal Workflow chart illustrates that in order to send a message to a desired physician, the patient clicks on the link "message", the message is composed, and then the patient clicks "to" and "cc" to obtain a list of practice staff for receipt of the message. (Hashmat Decl. ¶36)

44.   The Patient Portal Workflow chart illustrates that once a message is composed it is sent to a unified database where it is stored for the person to whom the message was addressed. (Hashmat Decl. ¶37)

45.   The Patient Portal Workflow chart illustrates that with Patient Portal there is no content processor to analyze the content of any message.  (Hashmat Decl. ¶37)

46.   The Patient Portal Workflow chart illustrates that once the login is completed, the staff member can access the message that has been addressed to them.  (Hashmat Decl. ¶38)

47.   The Patient Portal Workflow chart illustrates that for a practice staff to send a message to the patient, the staff member selects the destination of the message based on identifying the patient from a list of patients.  (Hashmat Decl. ¶39)

48.   The destination of the message selected by the staff member is not determined by the content of the message.  (Hashmat Decl. ¶39)

49.   On January 5, 2012, Mr. Hashmat conducted an online demonstration of the Patient Portal product for inspection by Joseph Sameh and his counsel on behalf of 523 IP.  (Hashmat Decl. ¶40)

50.   The January 5, 2012 online inspection demonstrated to Mr. Sameh and his counsel how a user of Patient Portal first selects a recipient from a list of staff members and then composes a message to the selected staff member.  (Hashmat Decl. ¶41)

51.   The January 5, 2012 online inspection demonstrated to Mr. Sameh and his counsel that with Patient Portal all of the staff members are located at a single location which is the medical practice.  (Hashmat Decl. ¶41)

52.   The January 5, 2012 online inspection demonstrated to Mr. Sameh and his counsel that the message to the selected practice staff is stored in the unified database.  (Hashmat Decl. ¶42)

53.   The January 5, 2012 online inspection demonstrated to Mr. Sameh and his counsel that because the patient manually selects the staff member for receipt of the message before the message is composed, there is no need to determine the content of the message before the message is sent.  (Hashmat Decl. ¶42)

54.   The January 5, 2012 online inspection demonstrated to Mr. Sameh and his counsel that with Patient Portal there is no analysis of the content of the message as to where the message is sent because the patient is the one who selects the individual staff member who will receive the message.  (Hashmat Decl. ¶43)

55.   The January 5, 2012 online inspection demonstrated to Mr. Sameh and his counsel that with Patient Portal there is no routing processor for routing the message from the patient to the staff member.  (Hashmat Decl. ¶44)

56.   The January 5, 2012 online inspection demonstrated to Mr. Sameh and his counsel that the message is sent to the database where the staff member receives the message.  (Hashmat Decl. ¶44)

**Prosecution of the '523 Patent Before the PTO**

57.   Joseph Sameh filed U.S. Patent Application No. 10/115,393 entitled "Website Messaging System" on April 3, 2002 which issued by the PTO on April 20, 2010 as U.S. Patent No. 7,702,523.  (Ex. A, '523 patent.)

58.   When the application for the '523 patent was filed on April 3, 2002, the inventor described the invention as follows:

> "The method includes the steps of providing one or more web
> pages to the patient from the web site containing indicia of identity
> for each physician of the plurality of physicians and detecting
> selection by the patient of a physician of the plurality of
> physicians." . (Ex. A, '523 patent, col. 1, lines 40-44)

59.   The Sameh application was pending in the PTO for over eight years until it issued April 20, 2010.   (Ex. A, '523 patent.)

60.   The PTO examiner finally rejected independent claims 1, 16, and 31 under 35 U.S.C. §103(a) as being obvious over Loeb in view of Wright.  (Ex. B, Dec. on Appeal)

61.   The final rejection of claims 1, 16, and 31 was appealed to the Board of Patent Appeals and Interferences ("the Board").   The Board reversed the rejection of independent claims 1, 16, and 31 in a decision dated October 30, 2009.  (Ex. B, Dec. on Appeal)

**A.     Applicant's Response to First Action From Examiner**

62.   In response to the first action from the PTO examiner rejecting claims 1, 16, and 31 as being anticipated by the Loeb reference, Mr. Sameh filed Amendment A in which independent claims 1, 16, and 31 were similarly amended to distinguish over the Loeb reference.  (Ex. C, Amendment A)

63.   Mr. Sameh characterized the amendments to independent claims 1, 16, and 31 as clearly limited to the routing of messages based upon a message routing criteria established by the physician based upon the relative importance that the physician places upon each type of message. (Ex. C, Amendment A, p. 11.)

64.   In responding to the rejection of claims 1, 16, and 31 over the Loeb reference Mr. Sameh argued in Amendment A that nowhere within Loeb is there any teaching of "the physician providing a plurality of message destinations…. a respective criteria for routing

9

messages to each of the plurality of message destination… determining a message content of the message received from the requestor; selecting a message destination of the plurality of destinations with the respective routing criteria that matches the determined message content; and routing the message to the selected message destination". (Ex. C, Amendment A, p.12)

### B.      Examiner's Final Rejection of Claims

65.   In response to Amendment A, the examiner issued a final rejection of all pending claims, including independent claims 1, 16, and 31 as amended as being obvious over the Loeb reference in view of Wright.  (Ex. D, Final Rejection)

66.  In the final rejection the Wright reference was cited for the disclosure that physicians may provide routing criteria, for example, by specifying "in-out status".  (Ex. D, Final Rejection, p. 5)

67.  In the final rejection the examiner concluded that it would be obvious to combine the teachings of the Loeb and Wright references.  (Ex. D, Final Rejection, pp. 5-6)

### C.      Applicant's Appeal of Final Rejection of Claims

68.  In response to the final rejection Mr. Sameh filed a notice of appeal to the Board followed by an appeal brief on March 24, 2008.  (Ex. E, Appeal Brief)

69.  Mr. Sameh argued patentability of the rejected claims over the cited combination of the Loeb and Wright references for a number of reasons including the argument that the physician provides a plurality of message destinations for delivery of messages where the message destinations could be a physician's office, home phone, cell phone, a pager, or another physician on call for the physician or any other communication system designation that the physician desires. (Ex. E, Appeal Brief, p. 3)

70.  Mr. Sameh argued patentability of the rejected claims over the cited combination of the Loeb and Wright references for the reason that the physician provides a respective criteria for routing messages to each of the plurality of message destinations where the criteria could be defined to differentiate messages from patients who need immediate attention from messages from patients who can wait to hear from the physician. (Ex. E, Appeal Brief, p. 3)

71.  Mr. Sameh argued patentability of the rejected claims over the cited combination of the Loeb and Wright references for the reason that to send a message to the physician, the requestor accesses the web site and downloads a form that includes a number of information entry boxes that can be used to determine the content and reason for the message.  (Ex. E, Appeal Brief, p. 3)

72.  Mr. Sameh argued patentability of the rejected claims over the cited combination of the Loeb and Wright references for the reason that a determination is made of the information content of the message and a message destination is selected with the respective routing criteria that matches the determined message content. (Ex. E, Appeal Brief, p. 3)

73.  Mr. Sameh argued patentability of the rejected claims over the cited combination of the Loeb and Wright references for the reason that the message is routed to the selected message destination based upon the determined information content and routing criteria provided by the physician. (Ex. E, Appeal Brief, p. 3)

74.  In distinguishing over the Loeb reference Mr. Sameh argued that the Loeb reference has to do with the selection of the specific service provider by the patient and routing of the appointment request to the provider based on the selection by the patient.  (Ex. E, Appeal Brief, pp. 4-9)

75.   In distinguishing over the Loeb reference Mr. Sameh argued that the Loeb patient selects a provider and the patient's contact information goes to a single location so therefore there is no routing criteria under Loeb, no form, and no determination of a message content of the form under Loeb.  (Ex. E, Appeal Brief, p. 22)

76.   In distinguishing over the Loeb reference Mr. Sameh argued that under Loeb the routing criteria is provided by the patient, since it is exclusively the patient who selects the provider.  (Ex. E, Appeal Brief, p. 22)

77.   Mr. Sameh argued with the claimed invention messages are dynamically routed based on their priority provided by the physician.  (Ex. E., Appeal Brief, pp. 23-24)

**D.     Examiner's Answer to Applicant's Appeal**

78.   The examiner in his answer to the appeal brief of Mr. Sameh repeated the rejection of independent claims 1, 16, and 31 for obviousness over the combination of the Loeb and Wright references.  (Ex. F, Examiner's Answer, p. 4)

79.   In his answer to the appeal brief, the examiner acknowledged that the Loeb reference does not explicitly disclose the claim 1 feature of the physician providing a plurality of message destinations and the physician providing a respective criteria for routing messages to each of the plurality of message destinations.  (Ex. F, Examiner's Answer, pp. 5-6)

80.   In his answer to the appeal brief, the examiner maintained that the features absent from the Loeb reference are taught by the Wright reference and it would be obvious to combine the teachings of the Loeb and Wright references.  (Ex. F, Examiner's Answer, p. 6)

**E.     Applicant's Reply to Examiner's Answer**

81.   In response to the examiner's answer, Mr. Sameh filed a reply, pointing out that the examiner has admitted that "Loeb fails to explicitly disclose…the physician providing a plurality

of message destinations and the physician providing a respective criteria for routing messages to each of the plurality of message destinations." (Ex. G, Reply to Answer, p. 1)

82.   Mr. Sameh in his reply to the examiner's answer defined the term "criteria" as "a standard on which a decision or judgment may be based" and, as such, a routing criteria is a standard on which a routing decision or judgment is based. (Ex. G, Reply to Answer, p. 2)

83.   In the reply to the examiner's answer, Mr. Sameh argued that the routing of medical reports to pre-specified locations is not the same as routing messages from patients to their physicians based upon a content of the messages and the routing provided by the physician. (Ex. G, Reply to Answer, p. 2)

84.   In distinguishing over the cited combination of the references, Mr. Sameh argued that routing messages based upon a physician's status is not the same as routing messages based upon an information content of the message (Ex. G, Reply to Answer, p. 2)

85.   In the reply to the examiner's answer, Mr. Sameh pointed out that the claimed invention solves a problem of recognizing serious medical conditions and expediting delivery of a patient's request message from a patient to the physician that is customizable to the individual practice of a physician without resorting to an emergency room visit or direct contact between the physician and the patient. (Ex. G, Reply to Answer, p. 2)

86.   Mr. Sameh in replying to the examiner's answer asserted that claim 1 is explicitly limited to the feature of "criteria" because in order to recognize serious medical conditions, "a relative importance must be assigned to the request based upon a subjective criteria provided by the physician." (Ex. G, Reply to Answer, pp. 2-3)

87.   In the reply brief, Mr. Sameh conceded that claim 1 is limited to "the physician providing a respective criteria for routing message to each of the plurality of message destinations." (Ex. G, Reply to Answer, p. 4)

88.   In comparing the claimed invention with the Loeb reference, Mr. Sameh argued in his reply brief that Loeb teaches a patient selecting the physician so therefore if there is criteria under Loeb, then that criteria is exclusively under the control of the patient.  (Ex. G., Reply to Answer, p. 4)

89.   Mr. Sameh further explained in the reply brief that criteria controlled by the patient is not the claimed invention of criteria provided by the physician because it does not involve criteria for routing a message provided by the physician.  (Ex. G., Reply to Answer, p. 4)

90.   Mr. Sameh further argued that any criteria that results in routing to the same, single destination as under Loeb does not meet the claim limitation requiring a "plurality of message destinations".  (Ex. G, Reply to Answer, p. 4)

91.   Mr. Sameh in distinguishing over the Loeb reference clearly disavowed that the claim limitation requiring a "plurality of message destinations" is not met by an exercise of criteria that results in routing to the same, single destination.  (Ex. G, Reply to Answer, p. 4)

92.   Mr. Sameh further asserted in his reply brief that routing a message to the same single destination teaches away from the claimed invention involving routing messages to different destinations designated by the physician.  (Ex. G, Reply to Answer, pp. 4-5)

93.   In the reply brief Mr. Sameh disavowed the creation of appointment requests as involving a routing criteria based upon content.  (Ex. G, Reply to Answer, p. 6)

94.   Further, Mr. Sameh disclaimed that obtaining a list of providers involves the use of routing criteria.  (Ex. G, Reply to Answer, p. 6)

14

95.   Mr. Sameh took the position that there would be no reason to determine the information content of a request for an appointment from a selected provider unless a decision or judgment would not be required as to where the appointment request would be routed.  (Ex. G, Reply to Answer, p. 7)

96.   To further distinguish over the Loeb and Wright references, Mr. Sameh made the observation that messages under Loeb or Wright always go to the same destination.  (Ex. G, Reply to Answer, pp. 9-10)

97.   Mr. Sameh asserted in his reply that there would be no reason to differently route a message based upon a routing criteria provided by a message recipient in view of the teachings of any of the references or combination of references cited within the Office Actions.  (Ex. G, Reply to Answer, p. 10)

98.   Mr. Sameh gave the example that under Loeb, if the user selects physician "A", then the message always goes to physician "A" destination and similarly if the user selects physician "B" then the message always goes to physician "B".   Consequently, no routing criteria is required to route the message.  (Ex. G, Reply to Answer, p. 10)

99.   Mr. Sameh asserted that none of the references of record taken alone or in combination disclose the claimed invention of messages to different destinations based on the routing criteria provided by the recipient of the message and the content of the message forwarded by the sender.  (Ex. G, Reply to Answer, p. 10)

**F.      Oral Hearing Before the Board at PTO**

100.   An oral hearing on the appeal was held October 20, 2009 before the Board at the PTO with Mr. Sameh's represented by counsel.  (Ex. H, Hearing Record, p. 1)

101.  At the oral hearing, Mr. Sameh explained that the claimed invention facilitates access of patients to their physician and enhances the physician's ability to respond to requests to others.  (Ex. H, Hearing Record, p. 3)

102.  At the oral hearing, Mr. Sameh characterized the claimed invention as an automated on line triage system for handling the requests to the physician for assistance from the physician. (Ex. H, Hearing Record, p. 3)

103.  At the oral hearing, Mr. Sameh argued that the requests are routed to the desired location that the physician needs for the particular problem to be solved in the best way.  (Ex. H, Hearing Record, p. 3)

104.  At the oral hearing, Mr. Sameh described the Loeb reference as providing first a database of alternative medical procedures and second a physician referral system.  (Ex. H, Hearing Record, p. 3)

105.  At the oral hearing, Mr. Sameh further explained that under the Loeb reference the user accesses a database to select a physician from a list for a specific need and to make an appointment to fill that need.  (Ex. H, Hearing Record, pp. 3-4)

106.  At the oral hearing Mr. Sameh asserted that the [claimed] invention is completely different from the database access systems of the Loeb and Wright references.  (Ex. H, Hearing Record, p. 4)

107.  At the oral hearing, Mr. Sameh disavowed that the claimed features of selecting a message destination of a plurality of message destinations with the respective criteria that matches the determine message content reads on the Loeb disclosure of selecting a specific service provider from the list of providers.  (Ex. H, Hearing Record, pp. 4-5)

108. Mr. Sameh at the oral hearing, asserted that selecting a physician in Loeb is not the same as selecting a message destination as defined by the claimed invention.  (Ex. H, Hearing Record, p. 5)

109. At the oral hearing, Mr. Sameh further disavowed that selecting a physician from a list of physicians in Loeb is the same as selecting a message destination as defined by the claimed invention. (Ex. H, Hearing Record, p. 5)

110. At the oral hearing, Mr. Sameh's counsel made it clear that the destinations defined by the claimed invention are communication end points, such as the cell phone of the physician, the PDA of the physician, the physician's office, and so forth.  (Ex. H, Hearing Record, p. 5)

111. At the oral hearing, Mr. Sameh argued that it was err for the examiner to interpret destination to mean a physician selected from a list of physicians.  (Ex. H, Hearing Record, p. 6)

112. At the oral hearing, Mr. Sameh's counsel repeatedly argued that the physician is not the same as the destination.  (Ex. H., Hearing Record, pp. 6-7)

113. At the oral hearing, Mr. Sameh's counsel further distinguished the claimed invention over the Loeb reference by point out that in Loeb when the physician is selected, the message has not yet been created because the physician is first selected and then the user creates the message.  (Ex. H, Hearing Record, p. 8)

114. At the oral hearing, Mr. Sameh explained that the Loeb reference can be further distinguished from the claimed invention because the message does not exist at the time the physician is selected from the list of physicians; consequently, the selection of the physician is not based on the content of the message.  (Ex. H, Hearing Record, p. 8)

115. At the oral hearing, Mr. Sameh argued that there is no basis for the examiner to reject the claims based on Loeb for the disclosure that a request for an appointment is a message

to the physician because the destination to whom the message is sent is determined before the message is composed. (Ex. H, Hearing Record, p. 8)

**G.    Board Decision on Appeal**

116.   In the decision on appeal, dated October 30, 2009 the Board did not sustain the rejection of independent claims 1, 16, and 31 as being unpatentable for obviousness under 35 U.S.C. §103(a) over Loeb in view of Wright. (Ex. B, Decision on Appeal, p. 2)

117.   The Board found that each of the independent claims 1, 16, and 31 require routing the message to the selected message destination based upon the determined information content and routing criteria provided by the physician. (Ex. B, Decision on Appeal, p. 2)

118.   In the decision on appeal, the Board found that Loeb discloses selecting a specific service provider from the listing of qualified providers and requests from that specific provider an appointment. (Ex. B, Decision on Appeal, p. 3)

119.   In the decision on appeal, the Board found that there is no disclosure in Loeb of routing a message by determining information content and routing criteria provided by the physician. (Ex. B, Decision on Appeal, p. 3)

120.   In the decision on appeal, the Board found that in Loeb the user simply selects a service provider from the list of providers, and it is the user himself or herself who makes the appointment. (Ex. B, Decision on Appeal, p. 3)

121.   The Board in the decision on appeal found that there is no disclosure in Loeb of routing a message to any selected message destination because in Loeb there is no disclosure of anything more than a given service provider's email or facsimile. (Ex. B, Decision on Appeal, p. 3)

122.   In the decision on appeal, the Board found that there is no teaching or an inference of obviousness in the cited combination of references for the claim limitation of routing the message to the selected message destination based upon the predetermined information content and routing criteria provided by the physician.  (Ex. B, Decision on Appeal, p. 4)

**H.   Notice of Allowance of Claims**

123.   Based on the decision of the Board, the examiner issued a notice of allowance of appealed claims 1, 16, and 31.  (Ex. I, Notice of Allowability, p. 1)

124.   The examiner's statement of reasons for allowance was: [t]he PBAI reversed the Examiner's Rejection of the claims of Loeb in view of Wright for failing to teach "routing a message by determining information content and routing criteria provided by the physician". (Ex. I, Notice of Allowability, p. 2)

125.   Following the notice of allowance, the '523 patent issued April 20, 2010.  (Ex. A, '523 patent)

**The WebPractice Product Made And Sold by Mars Medical Systems, Inc.**

126.   In 1999 Mars Medical Systems, Inc. ("Mars Medical") an Arizona corporation, developed a browser-based medical management system identified as NetPractice Manager ("NetPractice") under the leadership of Mark H. Conner, president of Mars Medical.  (Conner Decl. ¶¶2, 3)

127.   The core product of NetPractice was a browser-based practice management system that provides patient appointment and resource scheduling for a single or multi-provider/location practice.  (Conner Decl. ¶8)

128.   Within NetPractice were provided a number of suites of products including NetSchedule, NetCollections, and NetTools, which includes WebPractice Manager

("WebPractice"), a secure web-browser interface for patient-provider communication.  (Conner Decl. ¶9)

129.  The WebPractice product is an Internet browser-based secure interface that allows patients to communicate with their health care providers.  (Conner Decl. ¶¶10,11)

130.  WebPractice was developed in the third and fourth quarters of 1999 and a beta version was released in February 2000.  (Conner Decl. ¶¶10, 11)

131.  Mars Medical announced the launch of the NetPractice and WebPractice products in its February 16, 2000 newsletter.  (Conner Decl. ¶13)

132.  During the period March through June 2000, Mars Medical demonstrated the WebPractice product to attendees at a number of business development conferences and conventions throughout the United States.  (Conner Decl. ¶¶14, 15)

133.  On September 9, 2000 Mars Medical sold the WebPractice product to Southwest Physicians Network of Tucson, Arizona; Idaho Cardiology Associates of Boise, Idaho; and Thunderbird Internal Medicine of Glendale, Arizona.  (Conner Decl. ¶¶19-21)

134.  Sales by Mars Medical of the NetPractice and WebPractice products continued from first sales in 2000 up to 2007 when Noteworthy Medical Systems, Inc. ("Noteworthy") purchased Mars Medical.  (Conner Decl. ¶¶2-12)

135.  Subsequent to the acquisition of Mars Medical, Noteworthy continued the sale of the WebPractice product having the same functionality as the WebPractice and NetPractice product sold in 2000.  (Conner Decl. ¶¶2-12)

136.  CompuGroup Medical acquired Noteworthy and continues to sell the WebPractice product.  (Conner Decl. ¶¶4, 22)

137.  The NetPractice and WebPractice products were made, publicly used, and sold by Mars Medical prior to April 3, 2001.  (Conner Decl. ¶¶12-21)

138.  The NetPractice and WebPractice products are prior art to the '523 patent and are relevant to a determination of invalidity of the '523 patent including independent claims 1, 16, and 31.  (Conner Decl. ¶¶12-21)

139.  In a letter dated April 6, 2011 addressed to Paul Ruffin, President and CEO of Noteworthy Medical Systems, Inc., counsel for Mr. Sameh and 523 IP advised that it was their opinion that Noteworthy is using the patented technology of the '523 patent through some or all of the functionality provided in Noteworthy's web site and patient portal ("the NMS portal"). (Conner Decl. ¶24)

140.  In the April 6, 2011 letter 523 IP alleged that the NPS portal uses the technology of claim 31 in the '523 patent.  (Conner Decl. ¶23)

141.  The April 6, 2011 letter included a claim chart that applied the seven elements of claim 31 to Noteworthy's patient portal technology.  (Conner Decl. ¶24)

142.  In response to the 523 IP letter of April 6, 2011 accusing Noteworthy of infringing the '523 patent, Noteworthy's counsel responded by advising that Noteworthy's use of the invention in the '523 patent predated the filing date of the application for the '523 patent. (Conner Decl. ¶29)

143.  Noteworthy's counsel forwarded to 523 IP's counsel the affidavit of March H. Conner setting forth facts that established that Noteworthy practiced an invention substantially identical to the invention disclosed in the '523 patent as early as February 2000.  (Conner Decl. ¶30)

144.  Mr. Conner in his affidavit stated that Noteworthy practiced software substantially identical to the invention disclosed in the '523 patent as early as February 2000. (Conner Decl. ¶31)

145.  Mr. Conner's declaration described how the features of the NetPractice/WebPractice product corresponded to each and every element of claim 31 of the '523 patent. (Conner Decl. ¶¶32, 33)

146.  Noteworthy's counsel sent Mr. Conner's affidavit to 523 IP's counsel on August 18, 2012. (Conner Decl. ¶34)

147.  After August 18, 2012, Noteworthy received no further demands or communications from 523 IP or its counsel regarding Noteworthy's infringement of claim 31 of the '523 patent or offer to resolve the claim of infringement. (Conner Decl. §34)

148.  523 IP has ceased pursuing its claim against Noteworthy. (Conner Decl. ¶34)

149.  The April 6, 2011 letter from 523 IP accusing Noteworthy of infringing the '523 patent included a claim chart applying claim 31 to at least seven (7) elements of the Noteworthy NMS portal. (Conner Decl. ¶24)

150.  The claim chart provided with the April 6, 2011 letter from 523 IP includes seven (7) screen captures from Noteworthy's web site and captured images from a customer's demonstration of the NMS portal. (Conner Decl. ¶25)

151.  The screen captures and demonstration images of the NMS portal shown in the claim chart enclosed with the April 6, 2011 letter disclose all of the seven (7) elements of claim 31. (Conner Decl. ¶26)

152.   The NMS portal product as shown in the claim chart attached to the April 6, 2011 letter from 523 IP, corresponds to the WebPractice product that was made and sold in the United States by Mars Medical prior to 2001.  (Conner Decl. ¶27)

153.   The pre-2001 NetPractice/WebPractice product made and sold by Mars Medical included all the elements as defined by claim 31 and, therefore, as prior art anticipates claim 31 and renders it invalid.  (Conner Decl. ¶¶32,33)

154.   A product information and demonstration CD was produced in 2001 and contains a video recording made by Mr. Conner on November 23, 2000 demonstrating the WebPractice product.  (Conner Decl. ¶¶37, 38)

155.   The WebPractice product illustrated in the production information and demonstration CD includes all the elements of claim 31.  (Conner Decl. ¶38)

156.   Mr. Conner compared the elements defined in claim 31 with the elements in the pre-2001 NetPractice/WebPractice product.  (Conner Decl. ¶39)

157.   Based on the comparison of the elements of claim 31 of the '523 patent with the content of the pre-2001 NetPractice/WebPractice product, Mr. Conner determined that all of the elements of claim 31 existed in the NetPractice/WebPractice product that was made and sold by Noteworthy in the United States prior to April 2001.  (Conner Decl. ¶40).

**CureMD and Its All-In-One Product**

158.   CureMD was formed in 1999 in New York City.  Kamal Hashmat was one of the founders and Chief Executive Officer.  (Ex. J, K. Hashmat Dep. 7:4-25, 8:1-23)

159.   CureMD was founded with the mission of providing medical office solutions in one system for doctors.  (Ex. J, K. Hashmat Dep. 9:12-22)

160.  CureMD first developed the All-In-One product in 1999 as a suite of products for performing billing, scheduling, and electronic medical records in a doctor's medical practice. (Ex. L, K. Hashmat Dep. 10:14-25, 11:1-22)

161.  Patient Portal is one of the products in the All-In-One suite of products and was first made available to customers in the 2000/2001 timeframe.  (Ex. M, K. Hashmat Dep. 23:14-21, 44:6-9).

162.  The Patient Portal product has a "sticky note" functionality.  (Ex. N, K. Hashmat Dep. 23:14-21, 48:18-22, 63:2-21)

163.  Operation of Patient Portal is equivalent to the functionality of a "sticky note" where a message is written to a doctor and placed in the doctor's inbox where there is no electronic notification to the doctor that he has received a message unlike an email messaging system. (Ex. O, K. Hashmat Dep. 63:2-21)

164.  The source code that provided the sticky note functionality for patient portal was written beginning in 2000.  (Ex. P, K. Hashmat Dep. 57:16-24)

165.  The delivery of a message from a patient to a doctor using Patient Portal functions as an inbox in an office with no routing operation performed.  (Ex. Q, K. Hashmat Dep. 65:2-16)

166.  Esif Rashid, a CureMD employee, was the product manager for writing the source code for the Patient Portal product in early 2000.  (Ex. R, K. Hashmat Dep. 150:21-25, 151:1-25, 152:1-10)

167.  The functionality of the source code that was first written for Patient Portal is the same functionality as the source code for Patient Portal currently in use.  (Ex. S, K. Hashmat Dep. 152:15-25, 153:1-25, 154:1-8, 177:1-25, 178:1-20)

168. The Patient Portal product does not infringe claim 31 because Patient Portal does not provide the feature of routing of messages. (Ex. T, K. Hashmat Dep. 156:10-25, 157:1-9)

169. The Patient Portal product does not perform the function of criteria provided by the physician for routing messages to each of the plurality of message destinations. (Ex. U, K. Hashmat Dep. 161:11-24, 162:1-9)

170. The Patient Portal product does not include a downloaded form. (Ex. V, K. Hashmat Dep. 162:3-9)

171. Patient Portal does not have a content processor as defined by claim 31. (Ex. W, K. Hashmat Dep. 162:22-25, 163:1-13)

172. The "sticky note" functionality of Patient Portal does not have the functionality of a content processor as defined by claim 31. (Ex. X, K. Hashmat Dep. 163:14-25, 164: 1-25, 165:1-14)

173. The Patient Portal product does not infringe claim 31 because it does not have a routing processor. (Ex. Y, K. Hashmat Dep. 166:1-25, 167:1-14)

174. On September 11, 2013 Kamal Hashmat at his deposition conducted a demonstration of the operation of the Patient Portal product before Mr. Sameh and his counsel in which the demonstration established that the Patient Portal product does not infringe claim 31. (Ex. Z, K. Hashmat Dep. 168:18-25, 169:1-25, 170:1-25, 171:1-25, 172:1-25, 173:1-25, 174:1-25, 175:1-25, 176:1-25, 177:1-12)

Dated:  March 6, 2014

Respectfully submitted,

CUREMD.com., INC.

By their Attorneys,

/s/John M. Adams_____
John M Adams(admitted *pro hac vice*)
paip.law@verizon.net
PRICE & ADAMS, P.C.
P.O. Box 98127
4135  Brownsville Road
Pittsburgh, PA  15227
Telephone:(412) 882-7170
Facsimile:(412) 884-6650
.
John G. Aicher, Jr.
aicheresq@msn.com
377 Oak Street CS 601
Garden City, NY  11530
Telephone:(516) 745-6622
Facsimile:(516) 465-0673

Attorneys for Defendant CureMD.com, Inc.

<u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 6, 2014, I electronically filed the foregoing with the Clerk of Court and caused a true and correct copy of the foregoing to be sent via e-mail to the parties listed below on this 6th day of March, 2014.

Clay J. Pierce
*clay.pierce@dbr.com*
1177 Avenue of the Americas
41st Floor
New York, New York 10036
(212) 248-3140

-and-

Kenneth K. Dort
Patrick J. Kelleher
DRINKER BIDDLE & REATH LLP
191 N. Wacker Dr. #3700
Chicago, IL 60606
312.569.1000
*kenneth.dort@dbr.com*
*patrick.kelleher@dbr.com*

*Attorneys for Plaintiff 523 IP LLC*

_____
Attorney for Defendant