UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------------------X
:
523 IP LLC,                                          :
:
                                   Plaintiff,        :
                    v.                               :
:
CUREMD.COM,                                          :
:
                                   Defendant.        :
:
-----------------------------------------------------X

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 24, 2014

11 Civ. 9697 (KPF)

OPINION AND ORDER

KATHERINE POLK FAILLA, District Judge:

Plaintiff 523 IP LLC ("Plaintiff" or "523 IP") brought this action, claiming that the "Patient Portal" product of Defendant CureMD.Com ("Defendant" or "CureMD") is infringing 523 IP's patient-to-physician Internet messaging system, which was assigned Patent No. 7,702,523 (the "'523 Patent"). CureMD responds that its product does not infringe the '523 Patent and, further, that the Patent itself is invalid. Pending before the Court are Plaintiff's motion for partial summary judgment with respect to infringement, Defendant's motion for summary judgment with respect to non-infringement and invalidity, Plaintiff's applications to exclude witness testimony made within its motion for partial summary judgment, and Defendant's separate motion to exclude portions of Plaintiff's expert's testimony. For the reasons set forth in this Opinion, the Court (i) denies both parties' motions for summary judgment without prejudice to refiling; (ii) grants in part and denies in part Plaintiff's applications to exclude; and (iii) grants in part and denies in part Defendant's motion to exclude.

# BACKGROUND[1]

Because the record in this case is substantial, this Opinion is divided

into three sections: the first sets forth the undisputed facts related to the

---

[1]   The facts in this Opinion are drawn from 523 IP's Statement of Undisputed Material Facts ("Pl. 56.1") (Dkt. #53), CureMD's Response to 523 IP's Statement of Undisputed Material Facts and Statement of Additional Undisputed Material Facts ("Def. 56.1 Opp.") (Dkt. #69), 523 IP's Reply Statement of Undisputed Material Facts ("Pl. 56.1 Reply") (Dkt. #79), CureMD's Statement of Undisputed Material Facts ("Def. 56.1") (Dkt. #59), 523 IP's Response to CureMD's Statement of Undisputed Material Facts ("Pl. 56.1 Opp.") (Dkt. #64), the Expert Report of Joseph Sameh ("Sameh Report") (Dkt. #51-2), deposition testimony, which is identified using the convention "[Date][Name] Dep.," and various declarations, which are identified using either the convention "[Name] Decl.," if there is only one from that declarant, or the convention "[Date] [Name] Decl." if there are more than one, as well as exhibits thereto (Dkt. #51, 57, 58, 60, 63, 67, 70, 73, 77, 89). Declarations are cited according to the date they were signed, not the date they were filed. Citations to a particular Statement of Undisputed Facts pursuant to Local Rule 56.1 incorporate by reference the documents cited therein. Moreover, where facts stated in a party's Statement of Undisputed Facts are supported by testimonial or documentary evidence, and denied with only a conclusory statement by the other party, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)-(d).

This Opinion will refer to the parties' summary judgment submissions as follows: 523 IP's Memorandum of Law in Support of Its Motion for Partial Summary Judgment as "Pl. Br." (Dkt. #54); CureMD's Opposition to 523 IP's Motion for Partial Summary Judgment as "Def. Opp." (Dkt. #66); 523 IP's Reply Memorandum of Law in Support of Its Motion for Partial Summary Judgment as "Pl. Reply" (Dkt. #78); CureMD's Memorandum of Law in Support of Its Motion for Summary Judgment as "Def. Br." (Dkt. #56); 523 IP's Memorandum of Law in Opposition to CureMD's Motion for Summary Judgment as "Pl. Opp." (Dkt. #65); and CureMD's Reply Brief in Support of Its Motion for Summary Judgment as "Def. Reply" (Dkt. #75).

This Opinion will refer to the papers associated with CureMD's Motion to Exclude as follows: CureMD's Memorandum of Law in Support for its Motion to Exclude Testimony as "Def. Excl. Br." (Dkt. #81); 523 IP's Opposition to CureMD's Motion to Exclude as "Pl. Excl. Opp." (Dkt. #90); and CureMD's Reply Brief in Support of its Motion to Exclude Testimony as "Def. Excl. Reply" (Dkt. #91). The Court will not consider CureMD's "Corrected Reply," which was untimely filed without authorization. (Dkt. #92).

This Opinion will refer to the documents in the prosecution history of the '523 Patent as follows: Amendment A to Joseph Sameh's application, on the record as Def. 56.1 Ex. C, as "PH Amend. A"; the Examiner's Final Rejection of Sameh's application, on the record as Def. 56.1 Ex. D, as "PH Fin. Reject."; Sameh's Appeal Brief, on the record as Def. 56.1 Ex. E, as "PH App. Br."; the Examiner's Answer to the Appeal, on the record as Def. 56.1 Ex. F, as "PH Exam. Ans."; Sameh's Response to the Examiner's Answer, on the record as Def. 56.1 Ex. G, as "PH App. Resp."; the hearing on appeal, on the record as Def. 56.1 Ex. H, as "PH Hr'g Tr."; the Decision on Appeal from the Board of Patent Appeals and Interferences, on the record as Def. 56.1 Ex. B, as "PH Board Dec."; and the Notice of Allowance, on the record as Def. 56.1 Ex. I, as "PH All. Not."

For readability, when this Opinion quotes the Embodiment of the '523 Patent, reference numbers to elements of the drawings are excluded without notation. Additionally, the

invention, the accused product, and the procedural history of the case; the second sets forth the Court's claim construction; and the third sets forth the Court's findings on the parties' competing applications to exclude witness testimony and other evidence.

## A.    The Invention and the Accused Product

### 1.    The '523 Patent

523 IP alleges that CureMD's Patient Portal infringes its patent for a "Website Messaging System," the '523 Patent.  The allegedly infringed patent includes 35 claims: three independent claims (Claims 1, 16, 31) and 32 dependent claims.  (Pl. 56.1 ¶ 4).  Claim 31, an "apparatus" claim, is the only claim that 523 IP asserts CureMD is infringing, and the Patient Portal is the only CureMD product that 523 IP asserts infringes the '523 Patent.  (Pl. 56.1 Opp. ¶¶ 5-6).

At base, Claim 31 describes an apparatus by which a patient can send messages to a physician using a webpage.  The Summary of the '523 Patent describes the invention as follows:

> A method and apparatus are provided for processing a message from a patient for one of a plurality of physicians through a web site.  The method includes the steps of providing one or more web pages to the patient from the web site containing indicia of identity for each physician of the plurality of physicians and detecting selection by the patient of a physician of the plurality of physicians.  The method further includes the steps of determining an information content of the message and routing the message based upon the

---

Court notes that the patent uses "requestor" and "requester" interchangeably.  This Opinion retains the original spelling in quotations to the text of the patent, and uses "requestor" otherwise.

3

determined information content and a predetermined routing criteria provided by the selected physician.

('523 Patent col.1 l.38-48).  Claim 31 comprises a preamble and six elements, as follows:

> 31. An apparatus for routing a message from a requestor to a physician through a web site, such apparatus comprising:
>
> a plurality of message destinations provided by the physician;
>
> a respective criteria provided by the physician for routing messages to each of the plurality of message destinations;
>
> a form downloaded by the requestor from the web site;
>
> an at least partially complete form created by the requestor from the downloaded form and returned to the web site as a message to the physician;
>
> a content processor adapted to determine an information content of the message received from the patient and that selects a message destination of the plurality of message destinations by matching the routing criteria of the selected destination with the determined information content; and
>
> a routing processor adapted to route the message to the selected message destination based upon the determined information content and routing criteria provided by the selected physician.

(*Id.* at col.12 l.4-25).  The specification of the '523 Patent (the "Specification") contains a description of an embodiment of the invention that is about three and one-half pages in length and is accompanied by 10 figures.  (*Id.* at col.2-9, Figs. 1-10).

The prosecution of the '523 Patent took eight years, from 2002 to 2010. (Pl. 56.1 Reply ¶¶ 1-3).  Sameh filed U.S. Patent Application No. 10/115,393, entitled "Website Messaging System," with the United States Patent and

4

Trademark Office (the "PTO") on April 3, 2002.  (Pl. 56.1 Reply ¶ 1).  In 2006,

the PTO patent examiner (the "Examiner") issued an initial rejection of the '523

Patent as anticipated by the prior art, and Sameh filed an amended patent in

response.  (PH Amend. A).  In this amendment, Sameh revised, *inter alia*,

Claims 1, 16, and 31, "similarly limit[ing]" them in corresponding ways.  (*Id.* at

10).  Sameh amended Claim 31 as follows:

> 31. An apparatus for routing a message from a ~~patient to one of a plurality of physicians~~ <u>requestor to a physician</u> through a web site, such apparatus comprising:
>
> ~~website adapted to provide one or more web pages to the patient from the web site containing indicia of identity for each physician of the plurality of physicians;~~
>
> ~~a patient interface adapted to detect selection by the patient of a physician of the plurality of physicians;~~
>
> <u>a plurality of message destinations provided by the physician;</u>
>
> <u>a respective criteria provided by the physician for routing messages to each of the plurality of message destinations;</u>
>
> <u>a form downloaded by the requestor from the web site;</u>
>
> <u>an at least partially complete form created by the requestor from the downloaded form and returned to the web site as a message to the physician;</u>
>
> a content processor adapted to ~~determin~~ <u>determine</u> an information content of the message received from the patient <u>and that selects a message destination of the plurality of message destinations by matching the routing criteria of the selected destination with the determined information content</u>; and
>
> a routing processor adapted to route the message <u>to the selected message destination</u> based upon the determined information content and ~~a predetermined~~ routing criteria provided by the selected physician.

(*Id.* at 7-8).  This amendment brought the claims to their current, as-patented form.

On February 7, 2008, the Examiner issued a final rejection of Sameh's amended application, again finding that its claims were obvious in light of prior art under 35 U.S.C. § 103.  (Pl. 56.1 Opp. ¶ 60; PH Fin. Reject.).  Sameh appealed the Examiner's final rejection to the Board of Patent Appeals and Interferences (the "Board"), filing his appeal brief on March 24, 2008.  (Pl. 56.1 Opp. ¶ 61; PH App. Br.).[2]  On October 30, 2009, after consideration of briefing from both Sameh and the Examiner, and oral argument from Sameh's attorney, the Board reversed the Examiner's rejection, finding that Sameh's patent was not anticipated by prior art.  (Pl. 56.1 Opp. ¶¶ 61, 116-22; PH Board Dec.).  In accordance with this decision, the Examiner issued a "Notice of Allowance" on January 11, 2010.  (Pl. 56.1 Opp. ¶ 123; PH All. Not.).  Following the Notice of Allowance, the '523 Patent issued on April 20, 2010.  (Pl. 56.1 Opp. 56.1 ¶ 125; '523 Patent, at [45]).  On February 11, 2011, Sameh assigned all rights in the '523 Patent to 523 IP LLC, of which he is the managing partner.  (Pl. 56.1 Reply ¶¶ 6-7). [3]

---

[2]     Some of the delay in the prosecution of the '523 Patent was due to technical errors in the filings and subsequent refilings of amended documents.  (*See* Def. Br. 11).  In consideration of the delays in processing Sameh's patent, the PTO granted him a patent term adjustment, pursuant to 13 U.S.C. § 154(b), that added 2,444 days to the life of the patent. (Pl. 56.1 ¶¶ 4-5).

[3]     The only evidence of this assignment is Sameh's say-so.  CureMD objects that this is deficient and conclusory, but does not directly dispute the assignment or cite any evidence calling the assignment into question.  (Def. 56.1 Opp. ¶ 6).  Accordingly, the Court accepts as undisputed 523 IP's representation that the '523 Patent was actually assigned to it.

## 2.     The CureMD Patient Portal

CureMD was co-founded by brothers Kamal and Bilal Hashmat[4] in 1999 with the mission of providing doctors with medical office solutions in one system.  (Def. 56.1 ¶¶ 158-59; Feb. 28, 2014 Hashmat Decl. ¶ 3).  That same year, the company developed a suite of integrated software products for administering billing, scheduling, and electronic medical records in a doctor's medical practice (the "All-in-One Suite").  (Def. 56.1 ¶ 160).  By 2007, CureMD advertised the "Patient Portal" as a component of its All-in-One Suite.  (Pl. 56.1 Opp. ¶ 161).[5]  The current Suite contains three modules: an electronic medical records ("EMR") module, a practice management ("PM") module, and the Patient Portal module.  (Pl. 56.1 Reply ¶¶ 44, 46; Apr. 25, 2014 Hashmat Decl. ¶ 38).

CureMD's Patient Portal provides an online platform for patients to post or send messages to the staff of a given medical practice.  (Pl. 56.1 Reply ¶ 22; Pl. Opp. 56.1 ¶¶ 162-63).[6]  The message composition screen within Patient

---

[4]     Before his passing, Kamal Hashmat was the Chief Executive Officer of CureMD, and in that capacity was deposed as CureMD's designated witness pursuant to Federal Rule of Civil Procedure 30(b)(6).  Bilal Hashmat has since taken over as CEO, and has submitted declarations in support of CureMD's briefing in the instant motions in place of his brother.  (See Feb. 28, 2014 Hashmat Decl.; Apr. 25, 2014 Hashmat Decl.).

[5]     The parties dispute the year in which the allegedly infringing Patient Portal first became available as part of CureMD's All-in-One Suite.  (See Pl. 56.1 Opp. ¶ 161; Pl. 56.1 Reply ¶¶ 10, 12; Apr. 25, 2014 Hashmat Decl. ¶ 54 & Exs. B, C, D).  Resolution of this dispute is immaterial to the resolution of the issues in this Opinion.

[6]     The parties have engaged in a battle of semantics regarding the functioning of the Patient Portal — whether a "message" or "sticky note"-equivalent is "sent" or "stored" or "saved."  (See, e.g., Pl. 56.1 Opp. ¶¶ 11, 16, 20, 162-64; Pl. 56.1 Reply ¶¶ 11, 22).  In the context of the instant motions, this ostensible dispute is just that: a battle of semantics.  It is undisputed that, via the Patient Portal, a patient using a computer connected to the Internet in one location can type a message, press a "send" button,

Portal resembles that of an email: there is a "to" field, an optional "cc" field, a "subject" field, an attachment function, a field for the message itself, a handful of text-formatting options, and a "send" button.  (Apr. 25, 2014 Hashmat Decl. Ex. A; Pl. Reply 8; Pl. 56.1 Reply 23).  When using the "message" function in Patient Portal, a patient selects a recipient from a list of physicians and other medical office personnel.  (Pl. 56.1 Opp. ¶ 18; Pl. 56.1 Reply ¶¶ 23, 27).  Each individual is identified by his or her name and role in the practice (e.g., physician, attending physician, billing clerk); the list does not provide any contact information, such as an email address or phone number.  (Pl. 56.1 ¶ Opp. 19; Pl. 56.1 Reply ¶ 27).  After the patient sends the message, it is stored in a database.  (Pl. 56.1 Opp. ¶ 16).

The recipient of a message from a patient within Patient Portal accesses that message from within CureMD's application.  (Feb. 28, 2014 Hashmat Decl. ¶ 28 & Ex. F).  Messages from a patient are also automatically saved to the patient's electronic medical chart.  (*Id.* at ¶ 30 & Ex. F).  However, because the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191, 110 Stat. 1936 ("HIPAA"), limits who within a medical practice may legally view a patient's electronic medical records, the CureMD system allows a provider to restrict access to the medical chart and, by extension, to a patient's messages saved to that chart.  (Apr. 25, 2014 Hashmat Decl. ¶ 29; Pl. 56.1 Reply ¶ 29).

---

and that message becomes visible within the CureMD application on another computer to the selected physician or staff member.

Within the Patient Portal, there are discrete forms for certain frequently-occurring events, such as prescription refills, appointment requests, update requests, and registration requests. (Apr. 25, 2014 Hashmat Decl. ¶¶ 27-28). A patient chooses which type of form to use for his or her particular request on the website. (Pl. 56.1 Reply ¶ 41).[7] Hashmat explains, and 523 IP does not contest, that when a patient performs an action such as a refill request, the patient is limited in what he or she can communicate using the website, and, in particular, is not given an opportunity to submit a narrative message (termed "freeform" messaging in this Opinion). (Apr. 25, 2014 Hashmat Decl. ¶ 47).[8] Instead, the patient can select from a list of available refills and submit the request, which shows up in the EMR module's refill request inbox for clinical staff to process. (*Id.*). Similarly, appointment request forms go to an appointment request inbox, update request forms go to an update request inbox, and registration request forms go to a registration request inbox. (Pl. 56.1 Reply ¶ 46). These inboxes are also restricted to certain individuals or categories of individuals, for both legal, security, and practical reasons (e.g., a billing clerk does not need access to refill requests). (*Id.* at ¶¶ 31-32; Apr. 25, 2014 Hashmat Decl. ¶¶ 31, 33).

---

[7]     CureMD purports to dispute this fact, but then cites to evidence that actually supports it. (Def. 56.1 Opp. ¶ 41).

[8]     523 IP refers to "message content" as it relates to these forms, but does not argue that the patient inputs any freeform text into these forms.

**B.      Procedural Background**

On April 6, 2011, counsel for 523 IP sent CureMD a letter alleging that CureMD's Patient Portal was using the patented technology of the '523 Patent, and enclosing a preliminary claim chart purporting to apply the elements of Claim 31 to the Patient Portal product.  (Pl. 56.1 Opp. ¶¶ 8-9; Feb. 28, 2014 Hashmat Decl. Ex. A).[9]  On July 12, 2011, Bilal Hashmat sent a response to 523 IP's counsel denying the allegations of infringement and identifying the elements of the '523 Patent that he believed were not present in the Patient Portal product.  (Pl. 56.1 Opp. ¶ 10; Feb. 28, 2014 Hashmat Decl. Ex. B).  On August 26, 2011, 523 IP's counsel sent a letter in response, requesting documents in support of Hashmat's assertion that the Patient Portal was non-infringing.  (Pl. 56.1 Opp. ¶ 12; Feb. 28, 2014 Hashmat Decl. Ex. C).  Having apparently received no documents in response, on November 3, 2011, 523 IP's counsel sent a letter demanding access to CureMD's application and enclosing a draft complaint.  (Pl. 56.1 Opp. ¶ 13; Feb. 28, 2014 Hashmat Decl. Ex. D).  Shortly thereafter, Hashmat prepared and sent to 523 IP a response to 523 IP's claim chart, in which he outlined why he believed the Patient Portal was non-infringing.  (Pl. 56.1 Opp. ¶ 14; Feb. 28, 2014 Hashmat Decl. Ex. E).

---

[9]      The letter sent to CureMD was part of a self-described "ambitious" patent-enforcement campaign commenced by Sameh and his lawyers in late spring 2011.  (May 30, 2013 30(b)(6) Sameh Dep. 116-17, 124).  During that time, 523 IP's counsel engaged in a flurry of correspondence with over a dozen companies, accusing each of them of infringing the '523 Patent.  (*Id.* at Ex. 19-62).  According to Sameh, the other infringement claims are currently being held in "abeyance" (*id.* at 157-58) in order to "see what happens with CureMD," which is effectively a "litmus test" case (*id.* at 158).

On December 30, 2011, 523 IP filed the instant action against CureMD, alleging direct infringement under 35 U.S.C. § 271(a), indirect infringement by inducement under 35 U.S.C. § 271(b), and contributory infringement under 35 U.S.C. § 271(c), and seeking damages, injunctive relief, and fees.  (Dkt. #1). 523 IP amended the complaint on June 21, 2012 (Dkt. # 10), and CureMD answered on August 2, 2012, denying infringement and asserting six affirmative defenses: failure to state a claim; non-infringement; invalidity; prosecution history estoppel; laches, estoppel, acquiescence, or waiver; and unclean hands (Dkt. #15).  CureMD asserted no counterclaims.

523 IP moved for partial summary judgment with respect to infringement, seeking to leave damages issues for trial, on February 28, 2014. (Dkt. #50).  Included in that motion and in subsequent responsive papers were applications for the exclusion of CureMD witnesses' testimony.  (*See* Dkt. #50, 65, 78).  On March 6, 2014, CureMD filed its motion for summary judgment with respect to non-infringement and invalidity.  (Dkt. #55).  Both summary judgment motions were fully briefed on May 16, 2014.  (Dkt. #65, 66, 75, 78). CureMD then filed a separate *Daubert* motion on May 20, 2014, seeking the exclusion of portions of the testimony of Joseph Sameh, 523 IP's expert and the inventor of the '523 Patent.  (Dkt. #81).  That motion was fully briefed on June 8, 2014.  (Dkt. #90, 91).

## CLAIM CONSTRUCTION

Claim construction is required before a determination regarding infringement can be made where there is a dispute between the parties over

11

claim meaning.  *See Apex Inc.* v. *Raritan Computer, Inc.*, 325 F.3d 1364, 1370 (Fed. Cir. 2003) ("A determination of infringement requires a two-step analysis. First, the court determines the scope and meaning of the patent claims asserted and second, the properly construed claims are compared to the allegedly infringing device." (citations, quotation marks, and alterations omitted)); *see also PSC Computer Prods., Inc.* v. *Foxconn Int'l, Inc.*, 355 F.3d 1353, 1357 (Fed. Cir. 2004) (declining to construe uncontested claims in determining the scope of an invention).

At a May 17, 2013 conference before the Honorable William H. Pauley III, the United States District Judge to whom this case was previously assigned, counsel for 523 IP indicated its position (not disputed by counsel for CureMD) that there was no need for a claim construction hearing because "the facts are pretty clear," but committed to advising the Court promptly if such a hearing were needed.  (May 17 Tr. 8).  The parties' briefing on their respective summary judgment motions belies counsel's assertion.  The parties do not agree on the correct interpretation of the claim at issue, Claim 31.  523 IP argues that the language of Claim 31 is clear as written and needs no further construction.  (Pl. Reply 3).  CureMD, however, argues that the terms of Claim 31 have no plain and ordinary meaning, are ambiguous, and need construction.  (Def. Opp. 6-7). The Court agrees.  523 IP is attempting to have its cake and eat it too: while arguing that no claim construction is necessary, 523 IP implicitly gives the claims a construction — and an impermissibly overbroad one at that — in support of its infringement arguments.

**A.   Applicable Law**

"It is a bedrock principle of patent law that the claims of a patent define the invention to which the patentee is entitled the right to exclude." *Phillips* v. *AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (citation omitted). Patent construction is a question of law, the interpretation of which is entrusted to judges. *Markman* v. *Westview Instruments, Inc.*, 517 U.S. 370, 391 (1996). However, "district courts are not (and should not be) required to construe every limitation present in a patent's asserted claims." *O2 Micro Int'l Ltd.* v. *Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1362 (Fed. Cir. 2008) (citing *U.S. Surgical Corp.* v. *Ethicon, Inc.*, 103 F.3d 1554, 1568 (Fed. Cir. 1997)). Rather, "[c]laim construction is a matter of resolution of disputed meanings and technical scope, to clarify and when necessary to explain what the patentee covered by the claims, for use in the determination of infringement." *Id.* (alteration in original) (quoting *U.S. Surgical*, 103 F.3d at 1568 ("[Claim construction] is not an obligatory exercise in redundancy.")). In construing a patent claim, a court "should look first to the intrinsic evidence of record, i.e., the patent itself, including the claims, the specification and, if in evidence, the prosecution history." *PC Connector Solutions LLC* v. *SmartDisk Corp.*, 406 F.3d 1359, 1362 (Fed. Cir. 2005) (citation omitted).

"The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation." *Phillips*, 415 F.3d at 1313. "In some cases, the ordinary meaning of claim language as understood by a person of skill in the art may be

13

readily apparent even to lay judges, and claim construction in such cases involves little more than the application of the widely accepted meaning of commonly understood words." *Id.* at 1314. Additionally, "the context in which a claim term is used in the asserted claim can be highly instructive." *Id.* (noting, as an example, that the claim at issue refers to "steel baffles," strongly implying that the term "baffles" does not inherently mean objects made of steel).

Other than the language of the patent claim itself, "the specification is the single best guide to the meaning of a claim term" to a person of ordinary skill in the art. *Curtiss-Wright Flow Control Corp.* v. *Velan, Inc.*, 438 F.3d 1374, 1378 (Fed. Cir. 2006). In other words, "claims must be read in view of the specification, of which they are a part." *Phillips*, 415 F.3d at 1315 (citation omitted). Within the specification, a patentee "can act as his own lexicographer to specifically define terms of a claim contrary to their ordinary meaning." *Abraxis Bioscience, Inc.* v. *Mayne Pharma (USA) Inc.*, 467 F.3d 1370, 1376 (Fed. Cir. 2006) (citation omitted). Although courts use the specification "to interpret the meaning of a claim," they must "avoid the danger of reading limitations from the specification into the claim" itself. *Phillips*, 415 F.3d at 1323. The task is "captur[ing] the scope of the actual invention," rather than "strictly limiting the scope of the claims to the embodiments disclosed in the specification or divorcing the claim language from the specification." *Id.* at 1324.

14

The prosecution history may also "inform the meaning of the claim language by demonstrating how the inventor understood the invention and whether the inventor limited the invention in the course of prosecution." *Phillips*, 415 F.3d at 1317.  Indeed, because the prosecution history includes the applicant's express representations made to the PTO examiner, it may be "of critical significance in determining the meaning of the claims." *Vitronics Corp.* v. *Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996).  The prosecution history's instructive value is mitigated, however, by the fact that it "represents an ongoing negotiation between the PTO and the applicant ... [and] often lacks the clarity of the specification." *Phillips*, 415 F.3d at 1317.

Disclaimers made during prosecution may define the scope of a claim, where there is a "clear and unambiguous disavowal of claim scope." *Saffran* v. *Johnson & Johnson*, 712 F.3d 549, 559 (Fed. Cir. 2013) (citation omitted), *cert. denied*, 134 S. Ct. 1023 (2014).  Applicants need not "submit affirmative disclaimers along the lines of 'I hereby disclaim the following ...' during prosecution ... to meet the applicable standard." *Id.*  Instead, a statement that "extends beyond illuminating 'how the inventor understood the invention,' [and] provide[s] an affirmative definition for the disputed term" can constitute a prosecution disclaimer.  *Id.* (citation omitted) (finding patentee's statement made in distinguishing prior art that "the device used is a sheet rather than a preformed chamber" not only disclaimed "chambers," but also affirmatively defined the device recited in the claims as a "sheet" (citations omitted)); *see also Sunovion Pharm., Inc.* v. *Teva Pharm. USA, Inc.*, 731 F.3d 1271, 1277 (Fed.

15

Cir. 2013) (holding that "repeated and definitive remarks" in prosecution history sufficed to provide a definition of a claim term (citation omitted)); *Uship Intellectual Properties, LLC* v. *United States*, 714 F.3d 1311, 1315 (Fed. Cir. 2013) (finding that any statement by the applicant "to the PTO characterizing [the] invention may give rise to a prosecution disclaimer").

In construing claims, the district court should not "redefine claim recitations or [] read limitations into the claims to obviate factual questions of infringement and validity." *Am. Piledriving Equip., Inc.* v. *Geoquip, Inc.*, 637 F.3d 1324, 1331 (Fed. Cir. 2011). Rather, the role of the district court in claim construction is to "give meaning to the limitations actually contained in the claims, informed by the written description, the prosecution history if in evidence, and any relevant extrinsic evidence." *Id.*

"The claims, specification, and file history, rather than extrinsic evidence, constitute the public record of the patentee's claim, a record on which the public is entitled to rely." *Vitronics Corp.*, 90 F.3d at 1583. Thus, "[i]n those cases where the public record unambiguously describes the scope of the patented invention, reliance on any extrinsic evidence is improper." *Id.*[10]

---

[10]   While 523 IP's designated expert Joseph Sameh purports to provide only an infringement analysis in his expert report, in doing so he implicitly posits an unduly broad claim construction, one that would essentially make sending any message to a physician or physician's office over the Internet a violation of his patent. The Court acknowledges Sameh's arguments regarding claim construction, but does not give them any special "expert" weight beyond their status as an interested party's argument. *See O2 Micro Int'l Ltd.*, 521 F.3d at 1362 n.3 ("[A]n inventor's self-serving statements are rarely relevant to the proper construction of a claim term."); *see also Markman*, 517 U.S. at 391 (holding claim construction is a matter of law for the court to decide). In any case, as discussed in the text, there is no need for the Court to consider any extrinsic evidence for the purposes of claim construction.

## B.      Analysis

Claim 31 consists of a preamble, the transition term "comprising," and six elements or limitations.[11]  Only certain terms and limitations are disputed by the parties; the Court will therefore only construe disputed terms and terms that are necessary to the construction of disputed terms.

### 1.      The Preamble of Claim 31 Does Not Limit the Claim

The preamble of Claim 31 reads, "An apparatus for routing a message from a requestor to a physician through a web site, such apparatus." ('523 Patent col. 12 l. 4-5).  CureMD argues that the term "web site" in the preamble should be construed to limit the claimed apparatus to handling messages that a requestor sends from a web site on the Internet.  (Def. Br. 19).[12]  523 IP does

---

[11]      As discussed above, independent Claim 31, an apparatus claim, is the only claim of the '523 Patent that 523 IP alleges CureMD is infringing.  Both independent Claim 1, a method claim, and independent Claim 16, another apparatus claim, however, correspond to Claim 31 in structure, content, and vocabulary.  (*Compare* '523 Patent col. 9 l. 16-36 (Claim 1), *with* col. 10 l. 31-51 (Claim 16), *and* col. 12 l. 4-25 (Claim 31)).

Throughout the prosecution history, Sameh consistently represented that his arguments relating to each of Claims 1, 16, and 31 were applicable to all of those claims: in his amendment following the Examiner's first rejection, he argued for the patentability of all three claims together (PH Amend. A 10-12); in his Appeal Brief, Sameh argued that Claims 16 and 31 were not anticipated by the prior art by referencing the arguments made for the same purpose with regard to Claim 1 (PH App. Br. 27, 28); and in his Response to the Examiner's Answer on appeal, Sameh also made arguments for patentability of all three claims together (*see generally* PH App. Resp.).  Accordingly, the Court considers Sameh's statements regarding the scope and language of all of three claims as relevant to the understanding of Claim 31, and does not needlessly distinguish among arguments made about those claims in its discussion of the prosecution history.

[12]      CureMD also posits a construction of the term "requestor," as it is defined in the Specification.  (Def. Br. 19).  523 IP does not dispute CureMD's construction, and indeed, as it concerns this particular term, the patentee has acted "as his own lexicographer," *Abraxis Bioscience, Inc.*, 467 F.3d at 1376, by defining the term in the specification.  The Specification indicates that the terms "requestor" or "patient" are used interchangeably to refer to "any of patients, associates of the physician or to other physicians passing messages through the system." ('523 Patent col. 2 l. 19-22).  As used elsewhere in the patent, the terms "patient" and "requestor" are thus understood to have that meaning.

not dispute that the apparatus necessarily involves a "web site," but argues that construing the preamble "would be a pointless exercise in redundancy." (Pl. Opp. 21 n.3 (citing *U.S. Surgical Corp.*, 103 F.3d at 1568)).  The Court agrees, in view of the content of the preamble and the applicable law.

As a threshold issue, whether and to what extent a preamble limits a patent claim is unsettled; the general rule is that preamble language acts only as a limitation on the claim when it "recites essential structure or steps, or if it is necessary to give life, meaning, and vitality to the claim." *Eaton Corp.* v. *Rockwell Int'l Corp.*, 323 F.3d 1332, 1339 (Fed. Cir. 2003) (citations and quotation marks omitted).  This determination is made on a case-by-case basis. "When limitations in the body of the claim rely upon and derive antecedent basis from the preamble, then the preamble may act as a necessary component of the claimed invention." *Id.*  "A preamble is not limiting, however, where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." *Symantec Corp.* v. *Computer Assocs. Int'l, Inc.*, 522 F.3d 1279, 1288 (Fed. Cir. 2008) (citations and quotation marks omitted).

The preamble of Claim 31 identifies the kind of invention as an apparatus (as opposed to, for example, a process) and describes the purpose of the invention as that of a means to route messages from a requestor to a physician through a web site.  Basically, it "only [] state[s] a purpose" of the invention.  *Symantec Corp.*, 522 F.3d at 1288.  That the invention is online as part of a website is already apparent from the name of the patent, "Website

18

Messaging System" ('523 Patent, at [54]), and from the context of the claim, and is in any case uncontested by 523 IP (Pl. Opp. 21 n.3).

CureMD could argue (although it does not) that, as in *Eaton Corp.*, the "limitations in the body of the claim rely on and derive antecedent basis from the preamble." 323 F.3d at 1339 (finding that, where a limitation stated "during *the* gear shift ratio," it referred back to the particular sequence defined by the preamble (emphasis in *Eaton Corp.*)). The first, second, and fourth elements of Claim 31 all refer to "*the* physician"; the third element refers to "*the* requestor"; and the third and fourth refer to "*the* web site." However, while it is true that each of these uses of the definite article "the" refers back to the use of the term in the preamble, the preamble itself serves merely as a reference point. Unlike *Eaton Corp.*, the preamble here does not contain substantive, structural descriptions. Nothing in Claim 31's preamble gives the claim "life, meaning, and vitality." *Id.* The Court will therefore not consider the preamble as a limitation to the claimed invention or further construe its meaning.

### 2.      "Comprising" Means "Including But Not Limited To"

The meaning of the term "comprising" is not disputed by the parties, but the Court construes it here because, as the word appears in patents, it has a distinct legal meaning that aids the Court in delineating claim scope. As used in a patent's preamble, "comprising" means including but not limited to — it "raises a presumption that the list of elements is nonexclusive." *Dippin' Dots, Inc.* v. *Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007). Notably, however, "'[c]omprising' is not a weasel word with which to abrogate claim limitations."

19

*Id.* (alteration in original) (quoting *Spectrum Int'l, Inc.* v. *Sterilite Corp.*, 164 F.3d 1372, 1380 (Fed. Cir. 1998)).  Where "'comprising' appears at the beginning of the claim[,] … [it] indicates … that an infringing process could practice other steps in addition to the ones mentioned."  *Id.*  All the enumerated steps or elements, however, must be practiced "as recited in the claim for a process to infringe."  *Id.*  Thus, the Court construes Claim 31 as necessarily including the six enumerated limitations, while acknowledging that elements in addition to those recited may be found in an apparatus within the scope of the claim.

### 3. Multiple Recipients Within a Single System Do Not Constitute a "Plurality of Message Destinations Provided by the Physician"

The proper construction of Claim 31's limitation of "a plurality of message destinations provided by the physician" is hotly disputed by the parties.  ('523 Patent col.12 l.6-7).  CureMD contends that the Court should construe "a plurality of message destinations" to mean "communication devices" — such as a cell phone, pager, palm pilot, or computer — "selected by the physician under any of a number of communication formats to deliver messages to the physician."  (Def. Br. 20-21).  Arguing prosecution disclaimer, CureMD further asserts that Sameh, in prosecuting his patent, asseverated that a single database that permits access to messages by multiple recipients did *not* constitute a "plurality of message destinations."  (*Id.* at 20, 26).  523 IP also relies on the prosecution history, but argues from it that the term "plurality of message destinations" should be construed broadly to include not only devices, but also other individuals ("other physicians, residents, staff"), as

20

well as multiple staff members selected as recipients by patients accessing messages on a "unified database." (Pl. Opp. 22 (citing PH App. Resp. 5)).

Based upon consideration of the claim language, as well as a review of the Specification and the prosecution history, the Court agrees with CureMD that "message destinations" means devices external to the patented system; agrees with 523 IP that such devices can belong to individuals other than the physician; and disagrees with 523 IP that multiple recipients within a single system constitutes "a plurality of message destinations." Accordingly, the Court adopts its own construction of the limitation as described below.

First, the Court considers the language of the claim itself: "a plurality of message destinations provided by the physician." A "plurality" necessarily means more than one message destination. This suggests that storage of messages on a "unified database" within the system itself, and accessed only through the system, does not constitute a "plurality of message destinations." (*See* Def. Br. 26). But 523 IP argues that multiple recipients within a database means multiple destinations because the messages are routed to the appropriate destination (recipient) within the database. (*See* Pl. Opp. 22). Either construction is reasonable given the claim language alone, so it is necessary to consult other intrinsic evidence to resolve the ambiguity.

Every reference in the Specification to a "message destination" is to one that exists outside the patented invention. For example, the Specification refers to: "any of a number of communication formats (e.g., Internet, voice channel through the public switched telephone network (PSTN), voice channel

21

through a cellular system, data through a cellular system, pager, palm pilot,
etc.)" ('523 Patent col.2 l.46-50); "a computer terminal, a telephone console and
a cell phone" (*id.* at col.2 l.60-61); "communication devices of other physicians
or non-physicians" (*id.* at col.3 l.12-13); a "list of communication devices" (*id.*
at col.8 l.5); a "pager" (*id.* at col.8 l.29); a "computer" (*id.* at col.8 l.33, 50); and
"a cell phone or a telephone" (*id.* at col.8 l.55).  The Specification repeatedly
refers to "communication devices" (*see id.* at col.2 l.55; col.3 l.3-4, 8, 11, 12,
15; col.8 l.5), and touts the ability of the claimed invention to "accommodate
the mobile nature of physicians" by "alter[ing] [the physician interface] to
include [a] changing range of communication devices" (*id.* at col.3 l.6-8).
Additionally, Figure 10 of the Specification illustrates a web page, a "Routing
Entry Form," on which the physician can enter "message destinations" and
order them according to the priority level of the message.  ('523 Patent Fig.10).
The examples of message destinations illustrated by the form are telephone,
pager, email, and the on-call doctor — all destinations outside the patented
system.  (*Id.*).

    While the Specification makes clear that a given communication device
can belong to someone other than the physician himself or herself (*see*, *e.g.*, *id.*
at col.3 l.12-13 ("communication devices of other physicians or non-
physicians"); col.6 l.11 ("a nurse or other assistant"); col.6 l.45 ("an office of the
physician")), it never teaches a message destination within the patented
invention itself.  *See Regents of Univ. of Minn.* v. *AGA Med. Corp.*, 717 F.3d 929,
936 (Fed. Cir. 2013) (confirming that the specification supported the district

court's claim construction because "every single embodiment disclosed in the []
patent's drawings and its written description is made up of two separate disks";
the specification never taught a single-piece construction). Because the
Specification "repeatedly, consistently, and exclusively" refers to "message
destinations" as communication devices outside the patented invention itself, it
defines the claim term thusly by implication. *In re Abbott Diabetes Care Inc.*,
696 F.3d 1142, 1150 (Fed. Cir. 2012) (finding that where the specification
"repeatedly, consistently, and exclusively" depicted sensors with no external
cables, it defined the claim term by implication as wireless sensors (citation
omitted)).

     The prosecution history only confirms this reading. It makes clear that
"plurality of message destinations" refers to destinations external to the
patented invention, and not to multiple recipients retrieving messages from a
single database. First, in response to the Examiner's first rejection and in
order to distinguish his invention from the prior art, Sameh added the instant
limitation to Claim 31 at the same time he deleted two others, as follows:

> 31. An apparatus for routing a message from a ~~patient
> to one of a plurality of physicians~~ requestor to a
> physician through a web site, such apparatus
> comprising:
>
> ~~website adapted to provide one or more web pages to
> the patient from the web site containing indicia of
> identity for each physician of the plurality of physicians;~~
>
> ~~a patient interface adapted to detect selection by the
> patient of a physician of the plurality of physicians;~~
>
> a plurality of message destinations provided by the
> physician ...

(PH Amend. A 7-8).  These deletions amount to Sameh's clear disavowal that the patient's selection of a recipient from a group of physicians constitutes a "plurality of message destinations."

Subsequent to this amendment, on appeal from the final rejection of his application by the Examiner, Sameh again gave only examples of "a plurality of message destinations to which the messages may be delivered" that were external to the patented system itself: "an office phone of the physician, a home phone of the physician, a cell phone, a pager, another physician on call for the physician, or any other communication system destination that the physician desires."  (PH App. Br. 3).

Finally, and contrary to 523 IP's current contentions (*see* Pl. Opp. 22; Pl. Reply 6),[13] Sameh's attorney announced clear disclaimers in oral argument before the Board on appeal: multiple "destinations" within a single "database" did not constitute "a plurality of message destinations" as contemplated by the patent.  First, Sameh's attorney described the two prior art systems.  In the first system, he explained, the consumer selects a physician from a list of

---

[13]   523 IP cites *Tex. Digital Sys., Inc.* v. *Telegenix, Inc.*, 308 F.3d 1193, 1204 (Fed. Cir. 2002), for the proposition that "[a]n argument during prosecution will disclaim claim scope *only* if the inventor has used words or expressions of 'manifest exclusion or restriction, representing a clear disavowal of claim scope.'"  (Pl. Opp. 6 (emphasis in original)).  This proposition misstates the law.  First, *Texas Digital* does not so rigidly restrict the standard by using the word "only."  More importantly, the Federal Circuit has backed away from the methodologies used in *Texas Digital.  See, e.g., Phillips*, 415 F.3d at 1319-24 (finding that the *Texas Digital* approach improperly restricts the role of intrinsic evidence in claim construction); *see also Saffran*, 712 F.3d at 559 (holding that affirmative disclaimers along the lines of "I hereby disclaim the following" are not required and that a statement affirmatively defining a disputed term is sufficient for prosecution disclaimer).  In any event, the Court here finds that there was a clear expression of manifest exclusion representing a clear disavowal of claim scope.

24

physicians, and then is able to send a request for an appointment to that physician within that system.  (PH Hr'g Tr. 4).  The second system has a database that acquires data from medical devices and puts them into reports; the reports are then distributed to "various destinations that the technician or administrator at the web site or at the data base provides for them to go."  (*Id.*).  Then came the disclaimer: "Both of them are database systems, whereas the invention is completely different in nature" — that is, it is not a database system.  (*Id.*).

Sameh's attorney further distinguished the prior art, clarifying that selected recipients within a single system were not the same as the "destinations" contemplated by the claim:

> [The Examiner's rejection] completely changes the essential meaning of [the term "a plurality of destinations provided by the physician"] by citing [the prior art's] selection of a physician from a list of physicians instead of a destination from a plurality of destinations which changes the terminology from destinations to physicians.  When you look at the first element of the claim, physicians providing a plurality of message destinations, makes it clear that physician is not the same as the destination.  The destination, if we look at the flow chart of the claim, the destinations are these communication end points, the cell phone of the physician, the PDA of the physician, the physician's office, and so forth.  There are numerous destinations set out in the specification.

(PH Hr'g Tr. 5).  Having thus explicitly declared that the claimed invention is "completely different in nature" from a "database system" in order to obtain the patent, and that selecting a physician from a list of physicians within that system is not a "destination," 523 IP cannot now argue that multiple message

25

recipients on a closed database system constitutes "a plurality of message destinations provided by the physician."  *See Omega Eng'g, Inc.* v. *Raytek Corp.*, 334 F.3d 1314, 1323 (Fed. Cir. 2003) (noting that "[t]he doctrine of prosecution disclaimer ... preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution").[14]

Given the foregoing review of the claim language, the Specification, and the prosecution history, the Court finds that a person of ordinary skill in the art would understand the first limitation, "a plurality of message destinations provided by the physician," as follows: "more than one communication device or end point that is external to the patented system and can belong to someone other than the physician, which device or end point is supplied by the physician for the delivery of messages."

### 4.    "Routing Criteria" Are Based on Priority

The parties' disputes over the construction of the term "message destinations" were a minor skirmish; their disputes over the construction of "routing criteria" are an all-out war.  The '523 Patent's second limitation provides for "a respective criteria provided by the physician for routing messages to each of the plurality of message destinations" ('523 Patent col.12 l.8-10), and the fifth and sixth limitations refer back to these as "routing criteria" (*id.* at col.12 l.18, 23).  CureMD argues that the term "routing criteria"

---

[14]    Sameh offered the same disclaimer to the Board in distinguishing his apparatus from the prior art; he argued that a patient selecting an individual physician from a list of physicians by specialty always results in the message being sent to "the same, single destination[, and] that same, single destination does not meet the claim limitation requiring a 'plurality of message destinations.'"  (PH App. Resp. 4).

should be construed to mean priority-based criteria supplied by the physician that instructs where a message should be sent based on its importance.  (Def. Br. 21).[15]  It requests that the Court adopt the following construction: "the physician makes the decision or exercises judgment as to the message destination where the message is routed based upon the relative importance assigned to the nature and content of the message as determined by the physician."  (*Id.* at 21-22).

523 IP argues that "routing criteria" should be construed to include the restrictions and permissions imposed by a physician — or a staff member operating with a physician's authority — on various end users of a messaging system.  (Pl. Opp. 22-24; Pl. Reply 6-7).  For example, 523 IP argues that "routing criteria" are applied where software is configured to prevent billing staff from seeing prescription refill requests and to permit them to see billing inquiries.  (Pl. Opp. 22-24; Sameh Report ¶¶ 74-77).  523 IP argues further that while priority of message is one sort of criteria, Figure 8 of the '523 Patent lists many more.  (Pl. Opp. 23-24; Pl. Reply 7).  Again, the Court declines to adopt either party's construction of the claim term and espouses its own based

---

[15]    CureMD also argues that a patient's selection of a recipient from a list, even where that list is provided by the physician, does not constitute "routing criteria."  (Def. Br. 21). The Court understands this argument, however, to relate not to the construction of "routing criteria," but rather to the construction of "content processor" and "routing processor" and their respective roles in applying routing criteria (as opposed to a patient applying those criteria).  Conceivably, a physician could provide all of the routing criteria to the patient for the patient's selection (for example, an instruction to check a particular box if a post-operative fever exceeded 100°F in order to send message to physician's cell phone) and the criteria would still be considered "routing criteria provided by the physician."  The parties frequently conflate "routing criteria" with their application in their briefing, leading to imprecise and repetitive construction arguments.

upon its independent review of the claim language, the Specification, and the prosecution history.

There are three iterations of the disputed limitation in the claim language itself: (i) "a respective criteria provided by the physician for routing messages to each of the plurality of message destinations" ('523 Patent col. 12 l. 8-10), (ii) "the routing criteria of the selected destination" (*id.* at col. 12 l. 18-19), and (iii) "routing criteria provided by the physician" (*id.* at col. 12 l. 23-24).  In the first iteration, the words "respective" and "to each" teach that the routing criteria are specific to each individual "message destination."[16]  The reference to "*the* routing criteria *of the selected destination*" (emphasis added) in the fifth limitation reinforces this construction.

The criteria are "for routing messages."  "Routing," as it is commonly understood, goes beyond "sending" or "transmitting"; it connotes a more active role in directing the message to a particular location or by a particular route. *See generally Dealertrack, Inc.* v. *Huber*, 674 F.3d 1315, 1324-25 (Fed. Cir. 2012).  The coupling of "routing" with "criteria" introduces ambiguity: what constitutes "routing criteria" in the context of the patent is not clear without further clarification from other intrinsic sources.  The Court also turns to the Specification and prosecution history to construe the term "provided by the physician": the claim language's repeated refrain that the routing criteria must

---

[16]    The Court does not construe this to mean that the criteria must be unique for each destination.  Theoretically, a physician could supply the same criteria for more than one destination.  That is beside the point: even if identical, the physician supplies criteria for each destination under the patent.

be "provided by the physician," does not alone exclude the possibility that it could be provided by someone acting with the physician's authority, such as a practice manager.

As described in the "Background of the Invention" section of the Specification, the claimed invention is an improvement over the "traditional method of contacting a physician after hours ... an answering service." ('523 Patent col.1 l.17-18). An answering service takes messages on the physician's behalf, so the physician need not provide after-hours contact information directly to patients. (*Id.* at col.1 l.17-19). This is useful for taking and receiving messages, the patentee says, but problematic in that "some calls could be handled without the physician's involvement." (*Id.* at col.1 l.24-26). The rub is that "only the physician is qualified to make a decision regarding the handling of his patients by others," so the physician must be involved in deciding whether an after-hours call merits immediate attention by the physician. (*Id.* at col.1 l.26-28).

Sameh's invention is intended to solve that very problem: it allows a physician to make a judgment call about the importance of a patient's message "without the physician's involvement." This suggests that the "routing criteria" operate as an automated stand-in for the physician's own judgment about the degree to which an after-hours message is important and should be brought to the attention of the physician. The corollary to the statement "only the physician is qualified to make a decision regarding the handling of his patients by others," is that only the physician himself or herself — and not another

29

individual — is qualified to set "routing criteria" that determines how the patient's message can be appropriately delegated.[17]

The remainder of the Specification only confirms this reading. The Specification never teaches anyone other than the physician himself or herself setting the routing criteria, nor even suggests that such deputation might be appropriate. Additionally, the words "priority" or "importance" in association with routing messages are together mentioned over 40 times in the three-and-one-half-page Embodiment. The only criteria even contemplated by the Specification to route messages are priority-related, and the Specification affirmatively characterizes criteria as such: "The criteria [are] necessarily subjective because the *relative importance* of information elements varies from one physician's practice to another physician's practice and in accordance with the preferences of one physician over another physician." ('523 Patent col.5 l.61-65 (emphasis added)).[18] In accordance with this characterization, the Embodiment illustrates the physician's providing of "routing criteria" in two overall steps: first, the physician categorizes message types by priority level; next, the physician provides "routing instructions" for each particular priority

---

[17]   Sameh asserts in his report that "administrative powers are bestowed on the administrator as an agent of the physician. In a medical practice, all the staff serve as physician extenders. Statements in the patent claim 'provided by the physician' include the administrator as an extension of the physician." (Sameh Report ¶ 89). As mentioned previously, these *post hoc* ruminations regarding claim construction are given no weight here beyond the argument of an interested party. *See O2 Micro Int'l Ltd.*, 521 F.3d at 1362 n.3.

[18]   In his appeal response brief, Sameh pointed to this very sentence of the Specification in arguing to the PTO that his invention was distinguishable from the prior art. (PH App. Resp. 3).

level, indicating to which device(s) messages of that priority level should be routed.

The first step is illustrated by Figures 8 and 9.  As an initial matter, and contrary to 523 IP's assertion that Figure 8 of the patent "lists many more" types of criteria other than priority (Pl. Reply 7), it does not.  As the Embodiment expressly states, Figure 8 illustrates a web page screen listing various "message type[s]" — *not* the criteria by which to route them.  ('523 Patent col.7 l.6).  The "message types" listed in Figure 8 include, for example, "refill requests," "billing requests," "emergency per caller," "problems with medication," "fever over: ___," "next day surgery questions," and "my wife Jane Jones."  (*Id.* at Fig. 8).

Indeed, Figure 8 strongly supports a construction of "routing criteria" that necessarily implicates message importance and priority.  The Embodiment explains how the screen represented by Figure 8 can be "used by the physician to establish a multi-level message forwarding methodology ... [in which] any number of priority levels could be used."  ('523 Patent col.6 l.26-33).  But, "[f]or purposes of simplicity," the Embodiment continues, "the system will be described as being based upon a two-level system of priorities."  (*Id.* at col.6 l.31-33).  The Embodiment then goes on to describe how the criteria effectuate the routing of various messages types: "At a highest, first level of importance, messages may be routed directly to a physician's sphere.[19]  At the second

---

[19]    "Communication sphere" is defined by the Specification as "the physical space proximate to the physician that may contain one or more communication devices." ('523 Patent col.2 l.53-55).

31

level, requests may be routed to a secondary destination (e.g., an office of the physician)." (*Id.* at col.6 l.41-44).  As an example, the Embodiment provides, "The message type STANDARD HOLD FOR OFFICE CALLS would always be classified as low priority unless the physician indicated otherwise." (*Id.* at col.7 l.8-10).  The Embodiment also describes how a freeform "other" entry field allows a physician to identify non-standard content — such as a spouse's name — for "high routing priority." (*Id.* at col.7 l.23-52 & Fig. 9).

The second step for a physician to provide "routing criteria" is illustrated by Figure 10.  Figure 10 represents a web page, a "Routing Entry Form," on which the physician can indicate the priority level of message that each "message destination" receives.  ('523 Patent Fig. 10).  For each destination, various fields allow the physician to list the "current content of the physician routing instructions," to provide an "ordering number," and to assign a "priority ranking." (*Id.* at col.8 l.20-38).  For example, for message content of the "highest priority," if the physician wishes to be paged first, the physician would number the priority ranking of the pager as "1" (route highest priority content to this device) and the ordering number of the pager also as "1" (route to this device first). (*Id.* at col.8 l.28-38).  If the physician also wished simultaneously to receive an email, such that he or she could review the content of the message when responding to the page, the physician could also list the priority ranking and ordering number of his email address as "1" for that type of content. (*Id.*).

The Specification teaches an unambiguous meaning of "routing criteria": a person of ordinary skill in the art would understand that "routing criteria" involve both the priority and importance of the message and must, as a stand-in for a physician's judgment, be provided exclusively by the physician.  But, to slay the slain, the Court has also examined the prosecution history, which reveals that Sameh made numerous, clear prosecution disclaimers confirming that routing criteria were priority-based and provided by the physician only:

- Initially, arguing that his amendments distinguished his invention from the prior art identified in the Examiner's rejection, Sameh stated: "As now amended, independent claims 1, 16, and 31 are *clearly limited* to the routing of messages based upon a message routing criteria established by the physician *based upon the relative (and subjective) importance* that the *physician* places upon each type of message."  (PH Amend. A 11 (emphases added)).

- Sameh employed a similar argument to refute the claim that his invention was not obvious in light of the combination of two prior art references: "[N]one of the cited references provide any teaching or suggestion of any method or system that allows a physician to route messages *based upon a set of priorities established by the physician.*"  (PH Amend. A 16 (emphasis added)).

- In his appeal brief to the Board after the Examiner's final rejection, Sameh again distinguished his invention from the prior art by explaining that the prior art "fails to provide a criteria for … *conditional routing based upon urgency or priority.*"  (PH App. Br. 21 (emphasis added)).

- In the same document, Sameh offered the following additional differentiation: "The claimed invention solves the very important problem of *how to route messages* such as patient requests or conveyance of clinical information to a physician or his/her staff *based upon the information within the message and the priority established by the physician.*"  (PH App. Br. 23 (emphases added)).

33

· Still distinguishing Claim 31 from the prior art, Sameh argued: "*[P]riority is implicit in a physician's ability to route messages.*" (PH App. Br. 24 (emphasis added)).[20] Specifically, Sameh asserted that "[t]he *priorities of the patient and/or physician* or the need to dynamically route messages from patients/requestors to one of a number of destinations defined by the physician *based upon priority* is not recognized in the cited references ...." (*Id.* (emphases added)).

· In his response to the Examiner's answer, Sameh emphasized that, in his invention, the physician, not the patient, controls the criteria: "[The prior art] teaches of a patient selecting a physician.   Therefore, if there is a criteria under [the prior art], then [those criteria are] exclusively under the control of the patient.... *[The prior art] does not involve a criteria for routing a message provided by the physician.*" (PH App. Resp. 4 (emphasis added)).   Later, Sameh declared: "The claimed invention uses content based intelligence to route messages *based upon their importance* to the message recipient." (*Id.* at 10 (emphasis added)).

---

[20]   Given this disclaimer in particular, 523 IP's current efforts to argue (without citation) that "to import [priority]" into Claim 31 "violates the Doctrine of Claim Differentiation" because "'high priority' is a limitation of dependent claims 8-11 and 23-26" are surprising, as well as meritless.  (*See* Pl. Reply 7).  In the first place, the rule of claim differentiation creates only a rebuttable presumption that the presence of a particular limitation in a dependent claim means that limitation is not also present in the independent claim.  *See Phillips*, 415 F.3d at 1314-15.  That presumption can, of course, be "overcome by a contrary construction dictated by the written description or prosecution history."  *Marine Polymer Techs., Inc.* v. *HemCon, Inc.*, 672 F.3d 1350, 1359 (Fed. Cir. 2012) (quoting *Seachange Int'l, Inc.* v. *C-COR, Inc.*, 413 F.3d 1361, 1369 (Fed. Cir. 2005)).  And here, as outlined above, the Specification and prosecution history are rife with support for a contrary construction.

The dependent claims that mention priority are not dependent on the independent Claim 31.  In any event, the dependent claims themselves do not suggest that criteria are unconnected to priority; rather they strongly imply that "criteria" and "priority" are inextricably linked.  For example, dependent Claim 8 refers to "high priority routing criteria" and "routine criteria provided by the physician."  ('523 Patent col.9 l.61-63).  But with regard to this particular statement, given the full disclaimer contained in the appeal brief, the patentee essentially disclaims claim differentiation in asserting the validity of, *inter alia*, rejected Claim 31 over the prior art: "However, even though priority is implicit in a physician's ability to route messages, at least some claims (e.g., claim[] 8, claim 12) are directed to the priority of the message.  This feature is completely absent from the prior art."  (PH App. Br. 24).

· In a paragraph defining "routing criteria," Sameh argued: "[T]he term 'criterion' is defined as 'a standard on which a decision or judgment may be based' (Webster's 3rd New International Dictionary (1993)).   As such, a routing criteria is a standard on which a routing decision or judgment is based. … *[T]he criteria for routing messages provides a standard upon which a decision can be made about whether the message is to be routed at a relatively high priority or a lower priority.*"   (*Id.* at 11 (emphasis added)).

In sum, the Specification unambiguously describes "routing criteria" in terms of the priority and the importance of the message.  What is more, in order to obtain his patent, Sameh clearly and unambiguously told the PTO that the claimed "routing criteria" were based on priority.  In both the patent itself and in the prosecution of the patent, Sameh "repeatedly, consistently, and exclusively," *In re Abbott Diabetes Care Inc.*, 696 F.3d at 1150, referred to the criteria as "provided by the physician."  That is the point: for the criteria to act as a stand-in for the judgment of the physician.  ('523 Patent col.1 l.26-28 ("[O]nly the physician is qualified to make a decision regarding the handling of his patients by others.")).

The Court thus construes the claim limitation "a respective criteria provided by the physician for routing messages to each of the plurality of message destinations," along with the antecedent references to "routing criteria," to mean: "Standards provided by a physician, and no one else, upon which a decision can be made about which of a plurality of message destinations to route a message based upon the importance and priority of that type of message to that physician."

35

### 5.   "Downloaded" Is Broadly Construed to Include Viewing on a Browser Screen

The parties also disagree on the appropriate construction of the claim limitation "a form downloaded by the requestor from the web site."  ('523 Patent col. 12 l. 11).  To some extent they argue past each other: CureMD asserts a construction that centers around the term "downloaded," while '523 IP retorts with one that centers on the word "form."  Specifically, CureMD argues that the Specification and prosecution history teach narrow construction of the limitation that involves automatically identifying the patient by retrieving a Uniform Resource Locator ("URL"),[21] suggesting the following construction: "upon access to a physician's web site the requestor downloads a form from a web page to the patient's browser to enable the physician to identify whether the requestor is an existing patient or a new patient and thereby allow the patient to make a choice based on a number of criteria."  (Def. Br. 22).  CureMD also asserts, "The fact that a form appears on the user's screen is not evidence that the form is downloaded."  (Def. Reply 7).

In its papers, '523 IP conflates claim construction and infringement analysis to such a degree that it is difficult to ascertain its preferred

---

[21]    The Second Circuit has defined URLs as:

> Sequences of letters that identify resources in the web, such as documents, images, downloadable files, services, and electronic mailboxes. The URL is the address of the resource, and contains the protocol of the resource (*e.g.*, "http://" or "ftp://"), the domain names for the resource, and additional information that identifies the location of the file on the computer that hosts the website.

*Register.Com, Inc.* v. *Verio, Inc.*, 356 F.3d 393, 407 n.4 (2d Cir. 2004).

construction,[22] but it appears to argue implicitly that, as used in the '523 Patent, the "download[ing]" of a "form" should be construed to mean the same thing as accessing or viewing a form or a message screen on a web page and nothing more. (Pl. Opp. 24-25). After reviewing the Specification, the Court generally agrees with '523 IP, but adopts its own construction.

The plain language of the limitation is fairly generic: "a form downloaded by the requestor from the web site." ('523 Patent col.12 l.11). The use of "a" suggests no specific form, but rather multiple potential embodiments. "Form" itself suggests something fillable by a human being (the "requestor"). Additionally, the context of Claim 31, which involves the processing of the content of a message,[23] suggests that the form must be capable of allowing the requestor to enter a unique message, as opposed to merely clicking boxes or selecting from a list. But the word "form" itself is so generic as to demand some clarification from other intrinsic sources. *See Microsoft Corp.* v. *Int'l Trade Comm'n*, 731 F.3d 1354, 1360 (Fed. Cir. 2013), *reh'g denied* (Dec. 11, 2013) (finding that where a term, like "state," is especially "general on its face[,] … it begs for clarification from the specification"). Likewise, a reading of the plain language leaves the term "downloaded" ambiguous — it could mean

---

[22]   523 IP's rebuttal to CureMD's proposed construction of the '523 Patent is almost entirely focused on asserting that CureMD's Patient Portal uses a "form," and providing screenshots of that form, which does not assist the Court in its construction of the '523 Patent. (Pl. Opp. 24-25).

[23]   See the construction of "content processor," *infra*.

nothing more than viewing a form from the web site on the computer screen of the requestor, or it could mean something more, as CureMD suggests.

Turning next to the term "form," the Specification provides some illumination.  Every illustration of a form for a requestor to send a message to a physician includes a freeform textbox where the requestor can provide a unique, narrative message.  ('523 Patent Figs. 4-7).  It is apparent from the labelling of these textboxes that they are, in fact, freeform: "PLEASE DESCRIBE THE PROBLEM" (*id.* at Fig. 4), "DESCRIBE YOUR SYMPTOMS" (*id.* at fig. 5), and "PLEASE SUMMARIZE" (*id.* at Figs. 6, 7).  Further, the descriptions of these illustrations indicate that they are for the purpose of entering a freeform message, for example: "a text box … for entry of a description of the problem" (*id.* at col.5 l.11-12); "a large text box … for entry of descriptive information" (*id.* at col.5 l.21-23); and "text box … for entry of a message regarding the patient" (*id.* at col.5 l.40-41).  Finally, as further discussed below, as described by the Specification, the very purpose of the "content processor" is to digest and understand non-uniform content of messages.  (*See, e.g., id.* at col.7 l.36-63).  The term "form" as it is used in Claim 31 is therefore understood to include at least one field allowing the entry of a freeform message by the requestor.[24]

With regard to the term "downloaded": throughout the Specification, in almost every instance of the terms "downloaded" or "downloaded to,"  those

---

[24]   This does not, of course, exclude the possibility that it could also contain check boxes, text boxes, or drop-down lists in addition to a freeform text box; indeed, it appears the inventor intended to include some or all of those features as well as part of the patented invention.

38

words could be replaced with "accessed," "accessed on," or "accessed by," and the meaning in the context of the patent would be precisely the same.  For example:

· "a screen (web page) … may be downloaded to [/accessed on] a browser of a patient or other requestor" ('523 Patent col.3 l.46-47);

· "the web page … may be downloaded to [/accessed by] the patient" (*id.* at col.4 l.43-44);

· "a screen of FIG. 5 may be downloaded to [/accessed by] the requester" (*id.* at col.5 l.14-15);

· "If the requester should activate the OTHER box, then a single blank text box may be downloaded [/accessed]." (*id.* at col.5 l.44-45);

· "Once the physician downloads [/accesses] the screen…" (*id.* at col.8 l.36-37).

CureMD's argument that "downloaded" means "automatically identif[ying] the patient by retrieving the URL of the patient" finds its source in a few paragraphs in the Embodiment that discuss alternative ways the patient might be identified when using the claimed invention.  These paragraphs discuss storing "cookies" (i.e., text files that gather information about a computer user's internet habits) in the patient's browser, retrieving a URL, or simply having the patient fill out a form with personal information.  ('523 Patent col.3 l.30-50).  Significantly, however, this idea of "retrieving the URL of the patient" is discussed only once in the Embodiment, and then only in the alternative; it is not discussed at all in any of the 35 claims, the Background of the Invention, or the Summary; and it is not represented in any of the

drawings.  It is not put forward by the Specification as serving the underlying purpose of the patent, nor does it.  It is unambiguous from the Specification that the inventor intended the mention of "retrieving the URL of the patient" to be merely a potential embodiment, not a critical aspect of the invention. CureMD's cites to the prosecution history do not even mention this idea of identifying the patient with the URL as a critical part of the downloaded form.

The prosecution history does, however, provide support for the idea that the term "form," as it is used in the limitation, necessarily includes a field for freeform information entry.  In distinguishing his invention from a prior art reference that included a fixed form allowing a patient to select a physician and submit an appointment request, Sameh emphasized that in the prior art, in contrast to his invention, there is "no form and no determination of a message content of the form."  (PH App. Br. 22).

Thus, in light of the Specification and prosecution history, the Court construes the limitation "a form downloaded by the requestor from the web site" to mean: "a form containing at least one field for freeform message entry that can be accessed by the requestor on the web site."

### 6.  A "Content Processor" Dynamically Interprets the Content of a Message, Determines Its Priority, and Decides Where It Needs to Go Based on Priority

The next disputed limitation is "a content processor adapted to determine an information content of the message received from the patient and that selects a message destination of the plurality of message destinations by matching the routing criteria of the selected destination with the determined

40

information content." ('523 Patent col. 12 l. 15-20).  This limitation is the crux of the claimed invention: it pulls together the "message destinations," the "routing criteria," and the content of the patient's message.  Moreover, it was the function of the content processor that the Board found to be absent from the prior art, and that served as the basis for the overturning of the Examiner's final rejection.  (*See* PH Board Dec. 4; *see* PH All. Not. 2 ("[The Board] reversed the Examiner's rejection of the claims [in view of the prior art] for failing to teach 'routing a message by determining information content and routing criteria provided by the physician.'")).

Pointing to the Specification, CureMD argues that the Court should construe a "content processor" as "a system interface device for determining the information content of a message from a requestor and then selecting a message destination based on matching routing criteria set by the physician with the determined message content."  (Def. Br. 23).  Here, too, 523 IP's opposing claim construction arguments are so mixed up with its infringement arguments that it is difficult to parse them out.  523 IP seems to argue that "the content processor determines content, not routing"; that a device that sends separate entry forms designated for a particular purpose (such as an appointment request form) to a module for that particular purpose (such as a module or inbox containing only appointment requests) constitutes a "content processor" contemplated by the patent; and that a device that sends a message to a recipient identified by the requestor also constitutes a "content processor." (Pl. Reply 8; Pl. Br. 10-11).  The Court disagrees with 523 IP and generally

41

agrees with CureMD, but adopts its own construction of "content processor" based on its review of the claim language, the Specification, and the prosecution history.

The language of the limitation itself contains both familiar terms that have already been construed — "plurality of message destinations" and "routing criteria" — and new ones, namely "content processor," "adapted to," "determine," "an information content of the message," and "matching." A "content processor" is, to be tautological, a device or construct that processes content; the modifier "adapted to" indicates that the "content processor" is performing a specific role in the claimed combination. That role involves some cognitive-like function: the content processor "determine[s]," "selects," and "match[es]." And because the content processor "match[es]" one thing with another, it must necessarily "compare."

The term "content processor," however, requires elucidation. Context provides a little color on the meaning of the term "information content of the message": the limitation immediately preceding, which the Court does not independently construe because the parties do not dispute its meaning, refers to "an at least partially complete form ... returned to the web site as a message to the physician." ('523 Patent col.12 l.12-14). This suggests that the form as a whole constitutes the "message," and whatever fields are filled out by the requestor constitute its "information content." Even then, further clarification of these terms is necessary to understand how the content processor functions in the context of the claimed invention.

The Specification contemplates a content processor that does something more than simply send an appointment request form to an appointment request inbox because it is an appointment request form, or that sends a message to the recipient in the "to" box because it understands that to be the recipient.  Rather, the content processor is the device that applies the physician's priority-based routing criteria, and its function is therefore necessarily tied up with the importance of the message.  The Specification characterizes the content processor several times as digesting content and assigning importance to the message.  For example: it describes the "content processor" as a device that

> determine[s] the nature and content of the request based upon the information elements provided through the web pages (e.g., the identity of the requester, any classification information provided through the classification buttons and any text information received through the text boxes).  Based upon the determined nature and content of the request, [the content processor assigns] a relative importance ... to the request, based upon a subjective criteria provided by the physician.

('523 Patent col.5 l.51-60).[25]  The Specification later reiterates this function, stating that the content processor "examine[s] the content of the webpage under the criteria provided by the physician," and makes a "determination of the nature and importance of the message ... on any number of different levels."  (*Id.* at col.6 l.63-67).  The Specification then proceeds, at length, to

---

[25]   This passage from the Specification also supports the reading of "message" discussed above, that the form as a whole constitutes the "message," and whatever fields are filled out by the requestor constitutes its "information content."

43

provide examples of the content processor determining the content of a message, and thus its category and importance.  (*Id.* at col.7 l.8-63).

The Specification emphasizes that what the content processor is doing is an intelligent function.  To determine the information content, the content processor may examine the "information elements" of the form from the requestor ('523 Patent col.7 l.2), or it may perform a "key word search" (*id.* at col.7 l.23-63).  After the content processor determines the content and message type, it "may perform an element-by-element comparison between selected items for that message type [within the routing criteria] and the content of the message."  (*Id.* at col.7 l.1-7).

What the Specification suggests, the prosecution history confirms. Throughout the prosecution history, Sameh made numerous disclaimers that are directly contrary to the broad construction of content processor that 523 IP now asserts.  Indeed, precisely because the Examiner repeatedly expressed the concern that the patent could be read so broadly, Sameh repeatedly (and strategically) argued for a narrower construction to which he is now bound.

First, Sameh disclaimed 523 IP's current contention that a device that sends separate entry forms designated for a particular purpose to a module designated for that particular purpose constitutes a "content processor."  The Examiner specifically identified this construction as invalid: in the final rejection, the Examiner explained that a system in which a requestor uses an appointment request form to select a physician and request an appointment could be interpreted to mean that "the system determines that the information

44

content of the message is an appointment request." (PH Fin. Rej. 4). The

Examiner further clarified his understanding in his answer to Sameh's Appeal:

> To restate this, the patient of [the prior art] fills out an
> appointment request form. Logically, a message content
> determination will be made which determines the
> patient wants an appointment. The system routes the
> appointment message to the physician, based on the
> criteria provided by the physician ... [such as] to an
> email address, or done directly on-line.

(PH Exam. Ans. 18). The Examiner found this to be anticipated by the prior art

and unpatentable.

In appealing from the Examiner's findings, Sameh argued that, unlike

his invention, the prior art had to do with the "routing of the appointment

request to the provider based upon the selection by the patient," and that, also

unlike his invention, the request then "goes to a single destination." (PH App.

Br. 22). Specifically in response to the Examiner's answer, Sameh further

argued that routing to "pre-specified locations" was not the same as his

invention (PH App. Resp. 2), and that the prior art received "only appointment

requests, so there would be no reason to determine that the request is for an

appointment since that is the only purpose of the appointment request" (*id.* at

7).

Next, Sameh disclaimed the idea that a device that sends a message to a

recipient selected by the patient is a "content processor." This Opinion has

already discussed some of the implications of Sameh's Amendment A as it

concerned "message destinations," but the Amendment has relevance here, too,

and is thus repeated:

45

31. An apparatus for routing a message from a ~~patient to one of a plurality of physicians~~ <u>requestor to a physician</u> through a web site, such apparatus comprising:

~~website adapted to provide one or more web pages to the patient from the web site containing indicia of identity for each physician of the plurality of physicians;~~

~~a patient interface adapted to detect selection by the patient of a physician of the plurality of physicians;~~

…

a content processor adapted to ~~determin~~ <u>determine</u> an information content of the message received from the patient <u>and that selects a message destination of the plurality of message destinations by matching the routing criteria of the selected destination with the determined information content</u> …

(PH Amend. A 7-8). The deletion of the first two limitations entirely removes from the equation the patient's selection of where to send the message; the apparatus contemplated by Claim 31 only comes into play *after* the patient has selected a physician through that physician's website. The patient's selection of a physician or other recipient to whom to send a message is simply not part of the dynamic routing based on message content envisaged by the '523 Patent. Next, the amendment to the instant limitation significantly enhances the cognitive capabilities of the content processor from its previous iteration. Not only does it determine the information content, but also it makes comparisons and decisions based on that content and the provided routing criteria. This is much more than simply sending a message to a recipient designated by the requestor.

During the appeal process, Sameh further disclaimed patient-selected recipients in distinguishing his invention from the prior art: he emphasized that, in his invention, the "claimed routing is based upon the content of the message from the requestor," in contrast to the prior art, in which it is based on the patient's selection of a particular recipient (based on medical specialty) for an appointment request.  (PH App. Br. 23).  He asserted that the prior art "teaches of a patient selecting the physician," which meant the routing criteria were "exclusively under the control of the patient," not the physician as in his invention.  (PH App. Resp. 4).  Selection of a physician, even if based on medical specialty, Sameh pointed out, "always results in routing to the same, single destination."  (*Id*.).  If there is "only one destination" that is "predetermined by the communication system used and does not vary," then there is no application of "criteria because there is no decision or judgment." (*Id.* at 7).  Sameh contrasted that fact with his invention, which "decides the destination in real time based upon message content and criteria previously provided by the physician."  (*Id.* at 4).

Sameh emphasized that a requestor selecting a recipient and the system successfully sending that message to that recipient was *not* the same thing as a message going through a "content processor":

> In general, messages under [the prior art] always go to the same destination ... [I]f the user selects physician 'A,' then the message always goes to the physician 'A' destination.  If the user selects physician 'B,' then the message always goes to physician 'B.' ... [T]here [is not] any teaching or suggestion of any system where messages are differently routed based upon a routing criteria provided by a message recipient and a content

of a message forwarded by a sender as under the
claimed invention.

(PH App. Resp. 9-10).  Indeed, Sameh's disclaimer of single-destination routing
applies equally to the appointment request situation; it is clear from the
prosecution history that any protections inhering in the '523 Patent do not
extend to the situation where a user's selection of "appointment request"
results in the user's message being routed to the "appointment request" inbox.
Finally, like the Specification, the prosecution history characterizes the
"content processor" to have a cognitive-like function: "The claimed invention
uses content based intelligence to route messages based upon their importance
to the message recipient."  (*Id.* at 10).

If the "routing criteria" are a stand-in for the physician's judgment, then
the "content processor" is the stand-in for the physician's brain.  (*See* '523
Patent col.1 l.26-28 ("[O]nly the physician is qualified to make a decision
regarding the handling of his patients by others.")).  That is, the content
processor is the thing that intelligently applies the standards provided by the
physician to the unique message before it.  The Court therefore construes
"content processor" to mean "a device that intelligently reviews the contents of
the form's fields, ascertains the message's content, compares that content to a
set of routing criteria provided by the physician, matches the message type to
the importance of that message to the physician, and selects where the
message should go in terms of priority."  The output of the content processer
would be a "routing instruction" (*see id.* at col.8 l.1-3) along the lines of, "this is
a high priority message that should be sent to the current high priority

48

destinations," or "this is a low priority message that should be sent to the current low priority destinations."

### 7. A "Routing Processor" Sends the Message Where the Content Processor Determines It Needs to Go

The last disputed term, the "routing processor," gets the message where it needs to go.  Based on its reading of the Specification, CureMD argues that this limitation should be construed as follows: "a system interface device that functions to deliver messages to the physician based upon the determined nature of the message and a set of delivery instructions provided by the physician to a selected communication device within the physician's communication sphere."  (Def. Br. 24).  Yet again, 523 IP's claim construction arguments are hopelessly tangled in its infringement arguments, and the Court must tease them out.  523 IP seems to assert that "routing processor" should be constructed to include permissions and restrictions applied to the ability to access messages in a closed system; for example, if refill requests are sent to a refill request inbox, and access to the refill request inbox is restricted to clinical personnel (excluding, say, billing and administrative personnel), then those permissions and exclusions are the handiwork of a "routing processor" as contemplated by the patent.  (Pl. Opp. 26-27; Pl. Reply 9).  This is nonsense — a flippantly broad construction, untethered to the language of the claim.  The Court agrees with the principles underlying CureMD's preferred construction of the limitation, but adopts its own.

First, the Court considers the plain language of the limitation: "a routing processor adapted to route the message to the selected message destination

49

based upon the determined information content and routing criteria provided by the selected physician." ('523 Patent col. 12 l. 21-24).  Much of this language harkens back to the job the content processor has just done, thereby indicating that the routing processor builds on the work of the content processor, i.e., the "selected [by the content processor] message destination based upon the determined [by the content processor] information content[.]"  As noted previously, "routing" connotes something more than simply sending, a more active role in directing the message.  Given that the "message destinations" of the patented invention are external to the system itself, it makes sense that some intermediary needs to get the message from within the system to without, say, by dialing a phone or pager number or sending an email.[26]  What is unclear from the plain language is the role "routing criteria," which have been applied once by the content processor to determine message priority, play in the routing processor context.

The Specification provides clarification on this point.  For starters, it affirms the plain-meaning reading above, that the "content processor determines an information content and priority level of a message ... [and then] transfer[s] the message to the routing processor[.]"  ('523 Patent col. 7 l. 64-66).  Once it has a message, the routing processor uses "the priority level determined by the content processor" and routes messages to the physician according to a "prioritized list of communication devices within the physician's

---

26    523 IP's proposed claim construction in no way involves routing, based on a plain meaning of the term.

communication sphere." (*Id.* at col.8 l.1-6).  This list is contained in something

resembling the "routing instructions" of Figure 10, discussed above in

construction of the term "routing criteria." (*See id.* at col.8 l.4).  As described

in the Embodiment, these instructions match up the determined priority level

of the message with the device to which the physician wishes messages of that

priority level to go, and includes the phone or pager number, email address,

etc., of that device.  (*Id.* at col.8 l.1-60).  The routing processor has the

capability to send the message to the selected destination.  (*See id.* at col.8 l.6-

7, col.12 l.21-24).

The prosecution history confirms this interpretation of "routing

processor."  As touched on above, Sameh declared on appeal to the Board that

routing to "pre-specified locations," i.e., always sending reports or appointment

requests to the same, single destination, was the "not the same as routing …

based upon a content of the message and the routing [criteria] provided by the

physician" under the claimed invention.  (PH App. Reply 2).  The claimed

device, Sameh asserted, routes using "conditional routing criteria" that

"involves sending messages to *different destinations* designated by the

physician." (*Id.* at 5 (emphasis added)).  Based on this and all of the previous

construction analysis, "routing" is very clearly something that happens to a

message before it arrives at its destination — routing is how it gets there in the

first place — not something applied to messages that have already arrived at

their destination, as 523 IP contends.

The Court adopts the following construction of "routing processor" contained in the sixth limitation in Claim 31: "a device that receives from the content processor priority-based routing instructions for the destination of a message, matches the already determined priority of the message with the message destination(s) selected by the physician to receive messages of that priority, and effectuates the delivery of the message to the message destination(s)."  In other words, the "routing processor" takes the routing instructions of the "content processor" one step further to actually make a message delivery: "the content processor has indicated this is a high priority message that should be sent to the current high priority destination, which is currently the physician's cell number xxx-xxx-xxxx, so that is where the message is being sent."

The infringement and validity arguments that are advanced in the parties' summary judgment motions are predicated on each side's construction of Claim 31.  This section makes clear, however, that the Court's construction of that claim differs — at times, significantly — from the parties' proffered constructions.  While the Court could proceed to resolve the parties' summary judgments based on the claim construction articulated in this section, it believes that the fairer and more prudent course of action is to allow the parties an opportunity to reconsider their arguments in light of this construction.  Accordingly, the Court denies both parties' motions for summary

52

judgment without prejudice to refiling, as explained at the end of this Opinion.[27]

## THE EXCLUSION OF TESTIMONY

Both parties have also sought to exclude as inadmissible the testimony of the other party's witnesses.  Because on summary judgment the Court must consider *admissible* evidence in determining whether there is a genuine issue of material fact, *see* Fed. R. Civ. P. 56(c), *Patterson* v. *Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004), the Court will resolve these applications to provide clarity to the parties in the event they elect to resubmit motions for summary judgment.

## A.    Portions of Defendant's Witnesses' Testimony Will Be Excluded

Within its opening brief for partial summary judgment and other responsive papers, 523 IP has applied to the Court for the preclusion of the deposition testimony of Kamal Hashmat and the declaration testimony of both Bilal Hashmat and Mark H. Conner, under Federal Rule of Civil Procedure

---

[27]    In this regard, the Court observes that CureMD raised invalidity of the '523 Patent as an affirmative defense, but did not file a counterclaim seeking a declaratory judgment on that basis.  Consequently, the Court will only consider the issue of invalidity if 523 IP moves for, and obtains, summary judgment on the issue of infringement.  *See Pro-Tech Welding & Fabrication Inc.* v. *Lajuett*, 367 F. Supp. 2d 398, 410 (W.D.N.Y. 2005) (declining to reach affirmative defense of invalidity where accused device found non-infringing) (citing *Lacks Indus., Inc.* v. *McKechnie Vehicle Components USA, Inc.*, 322 F.3d 1335, 1346 (Fed. Cir. 2003) (declining to reach validity issues "because we have affirmed the trial court's grant of summary judgment of non-infringement and because invalidity was raised below merely as an affirmative defense to infringement"); *Cardinal Chem. Co.* v. *Morton Int'l, Inc.*, 508 U.S. 83, 93 (1993) (holding that an appellate court's affirmance of a finding of non-infringement is not per se a sufficient reason for vacating a declaratory judgment holding the patent invalid, but distinguishing between "[a]n unnecessary ruling on an affirmative defense" and "the necessary resolution of a counterclaim for a declaratory judgment")), *aff'd*, 173 F. App'x 824 (Fed. Cir. 2006) (per curiam).

37(c), for Defendant's purported failure to comply with its discovery obligations under Rule 26, and under Federal Rules of Evidence 701 and 702 as inadmissible expert testimony from lay witnesses.  As set forth herein, the Court grants its application in part and denies it in part.

### 1.    Background

#### a.    Kamal and Bilal Hashmat

Brothers Kamal and Bilal Hashmat co-founded CureMD in 1999.  (Pl. 56.1 Opp. ¶¶ 158-59; Feb. 28, 2014 Hashmat Decl. ¶ 3).  Before his passing earlier this year, Kamal Hashmat was Chief Executive Officer of CureMD, and in that capacity was deposed as CureMD's designated witness pursuant to Federal Rule of Civil Procedure 30(b)(6).  He was also deposed in his personal capacity.  Kamal Hashmat's testimony during his March 28 and September 11, 2013 depositions focused primarily on the functionality of the CureMD All-in-One Suite and the Patient Portal, the history and development of those products, and the licensing of Defendant's software.  At the end of his September 11, 2013 deposition, Kamal Hashmat also testified to his understanding of the infringement issues and his conclusions as to those issues based on his comparison of the language of the '523 Patent and the Patient Portal product, in response to questioning from his attorney.  (Sept. 11, 2013 Hashmat Dep. 156-69).

Bilal Hashmat has since taken over as CEO, and has submitted declarations in support of CureMD's briefing in the instant motions in place of his brother.  (*See* Feb. 28, 2014 Hashmat Decl.; Apr. 25, 2014 Hashmat Decl.).

The content of these declarations is consistent with and substantively the same as his brother's deposition testimony.  Bilal Hashmat's declarations describe: (i) his involvement in the initial correspondence with 523 IP accusing CureMD of infringement; (ii) the functionality of the CureMD All-in-One Suite and the Patient Portal, as well as the history and development of those products; (iii) his opinion that CureMD's Patient Portal does not infringe the '523 Patent, based on his comparison of the two; and (iv) his brother's live demonstration of the CureMD Patient Portal at his September 2013 deposition.  Bilal Hashmat's April 2014 declaration was also specifically offered "as a response to Mr. Sameh's analysis of the CureMD system as set forth in … his expert report." (Apr. 25, 2014 Hashmat Decl. ¶ 8).

### b.    Mark H. Conner

Mark Conner was the founder and president of MARS Medical Systems, Inc., until its purchase by Noteworthy Medical Systems in 2007.  (Conner Decl. ¶ 2).  According to Conner, in 1999 he "architected and led development of NetPractice Manager[,] the first fully functioning, browser-based practice management system." (*Id.* at ¶ 3).  CureMD relies on Conner's testimony as evidence of prior art that either anticipates the '523 Patent or renders it obvious.  (Def. Br. 32-40).  Accordingly, Conner's declaration sets out the timeline of development of the NetPractice Manager product, its features, and his opinion that those features — developed and in public use prior to the filing of the application for the '523 Patent — are the same as those contained in Claim 31 of the '523 Patent.  Conner's declaration also attaches exhibits

55

related to his testimony, many of which 523 IP contends were either not produced until after the close of expert discovery or not produced at all (until the filing of the declaration).  (Pl. Opp. 16).

### 2.    Applicable Law[28]

#### a.    Federal Rules of Evidence 701 and 702

Federal Rule of Evidence 701 constrains the opinion testimony of lay witnesses:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is:
>
> (a) rationally based on the witness's perception;
>
> (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and
>
> (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

Fed. R. Evid. 701.  The Advisory Committee's note describes the 2000 amendments to Rule 701 as aimed at two goals: (i) "eliminat[ing] the risk that the reliability requirements set forth in Rule 702 will be evaded through the simple expedient of proffering an expert in lay witness clothing"; and (ii) "ensur[ing] that a party will not evade the expert witness disclosure requirements set forth in Fed. R. Civ. P. 26 … by simply calling an expert witness in the guise of a layperson."  *Id.*, advisory committee's note.

---

[28]    When deciding issues in a patent case, the district court applies the law of the Circuit in which it sits to non-patent issues, and the law of the Federal Circuit to issues of substantive patent law.  In the context of evidentiary rulings regarding the admissibility of witness testimony, Second Circuit law applies generally, but Federal Circuit law determines the relevance of material that relates to an issue of substantive patent law.  *See Astra Aktiebolag* v. *Andrx Pharm., Inc.*, 222 F. Supp. 2d 423, 486 (S.D.N.Y. 2002) (collecting cases).

According to the Advisory Committee, what separates expert and lay testimony is that "lay testimony results from a process of reasoning familiar in everyday life," whereas "expert testimony results from a process of reasoning which can be mastered only by specialists in the field." Fed. R. Evid. 701 advisory committee's note (citation omitted); *see also United States* v. *Glenn*, 312 F.3d 58, 67 (2d Cir. 2002) ("a lay opinion must be rationally based on the perception of the witness.... This requirement is the familiar requirement of first hand knowledge or observation." (citation and quotation marks omitted)); *Bank of China, N.Y. Branch* v. *NBM LLC*, 359 F.3d 171, 182 (2d Cir. 2004).

"Although opinion testimony, whether offered by a lay witness pursuant to Fed. R. Evid. 701, or by an expert pursuant to Fed. R. Evid. 702, is not inadmissible simply 'because it embraces an ultimate issue to be decided by the trier of fact,' Fed. R. Evid. 704, it is not properly received 'merely [to] tell the jury what result to reach.'" *United States* v. *Garcia*, 413 F.3d 201, 210 (2d Cir. 2005) (quoting Fed. R. Evid. 704 advisory committee's note on 1972 Proposed Rules (citing 4 WEINSTEIN'S FEDERAL EVIDENCE § 701.05 (2d ed. 2004) (noting that courts should be wary of opinion testimony whose "sole function is to answer the same question that the trier of fact is to consider in its deliberations"))). "Indeed, the purpose of the foundation requirements of the federal rules governing opinion evidence is to ensure that such testimony does not so usurp the fact-finding function of the jury." *Id.* at 210-11 (finding inadmissible testimony in which investigating agent was "essentially telling the jury that he had concluded [the defendant] was guilty of the crimes charged").

### b.   Federal Rules of Civil Procedure 26 and 37

Where a party does not meet its discovery obligations, "[a] district court has wide discretion to impose sanctions, including severe sanctions, under Federal Rule of Civil Procedure 37." *Design Strategy, Inc.* v. *Davis*, 469 F.3d 284, 294 (2d Cir. 2006).  Pursuant to Rule 37(c)(1), if a party fails to provide information required by Rule 26(a) or (e), the party generally is not permitted to use that information at trial "unless the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1); *see also Agence France Presse* v. *Morel*, 293 F.R.D. 682, 685 (S.D.N.Y. 2013).  "The purpose of this rule is to prevent the practice of 'sandbagging' an opposing party with new evidence." *Underpinning & Found. Skanska, Inc.* v. *Travelers Cas. & Sur. Co. of Am.*, 726 F. Supp. 2d 339, 348 (S.D.N.Y. 2010) (citation and quotation marks omitted).

In determining whether to exclude evidence under this standard, a district court considers a nonexclusive list of four factors: (i) the party's explanation for its failure to disclose, (ii) the importance of the evidence, (iii) the prejudice suffered by the opposing party, and (iv) the possibility of a continuance.  *See Design Strategy*, 469 F.3d at 296 (citing *Patterson* v. *Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).  "The party that violates Rule 26 bears the burden of showing that its violation was either substantially justified or harmless." *Agence France Presse*, 293 F.R.D. at 685 (citing *Ritchie Risk-Linked Strategies Trading (Ireland), Ltd.* v. *Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012)).

3. **Analysis**

   a. **Portions of the Testimony and Declarations of Kamal and Bilal Hashmat Will Be Stricken**

523 IP first argues that the testimony of the Hashmat brothers constitutes inadmissible expert testimony from lay witnesses. (Pl. Reply 1).[29] It does not. Specifically, 523 IP argues that the testimony contained in Bilal Hashmat's declaration is based on "technical knowledge not shared by 'the average person in everyday life.'" (Pl. Opp. 15). This "technical content," 523 IP claims, consists of Bilal Hashmat "opin[ing] on what is and is not 'proved' by screen shots included in 523 IP's preliminary claim chart and on what is 'established' by his own opinions." (*Id.* at 14). 523 IP also protests that Kamal Hashmat offered similar expert opinion testimony — i.e., his conclusions on infringement — in his deposition. (Pl. Reply 1).

523 IP's frustrations are misplaced. CureMD does not proffer the brothers as expert witnesses (*see* Def. Reply 10), nor does either Hashmat testify about any "technical or other specialized knowledge," such as software coding or computer systems functionality. While the Hashmats were not the lead programmers who wrote the code for the CureMD software (*see* Sept. 11, 2013 Hashmat Dep. 150-51), as co-founders of the company they were "involved in the development of CureMD's system since its inception" (Apr. 25, 2014 Hashmat Decl. ¶ 4), and "assisted in the conception, design, and writing

---

[29]    523 IP makes this challenge as to the testimony of both brothers (Pl. Reply 1), but only elaborates its arguments as they pertain to Bilal Hashmat. Because it seems 523 IP intended its arguments to apply to the testimony of both brothers, the Court will read 523 IP's arguments as if they were written that way.

of the source code for CureMD's [system]" (*Id.* at ¶ 5).  The brothers had and have deep, personal knowledge of the CureMD system, its features, and its functionality.  They could testify to that personal knowledge.  And for them to look at their own system, which they know well, compare it to the language in the patent, and conclude "this is not that" — that is well within the purview of an opinion "rationally based on the witness's perception."[30]

Instead, the problem with the Hashmat brothers' testimony is that portions of it "usurp the fact-finding function of the jury."  *Garcia*, 413 F.3d at 211.  For example, Bilal Hashmat states in his first declaration, when discussing 523 IP's claim charts, "The screen shots for element nos. 2 and 3 in the 523 IP claim chart do not support the presence of a plurality of message destinations for the CureMD Patient Portal component."  (Feb. 28, 2014 Hashmat Decl. ¶ 17).  As in *Garcia*, Bilal Hashmat is "essentially telling the jury that he [has] concluded" that 523 IP's evidence does not support infringement.  *See* 413 F.3d at 210.

Determining the weight and sufficiency of the evidence is the factfinder's job, not Bilal Hashmat's.  And his conclusion does not assist the factfinder in doing that job.  What does assist the factfinder is, for example, the information he goes on to provide in support for his conclusion: "The patient selects a user from a list of users where the message is to be sent [within] CureMD Patient

---

[30]  Just because Bilal Hashmat notes in one of his declarations that it is in "response to Mr. Sameh's analysis of the CureMD system as set forth in … his expert report" (Apr. 25, 2014 Hashmat Decl. ¶ 8) does not, as 523 IP argues, transmogrify his declaration into a "rebuttal expert report" (*see* Pl. Reply 2).  A lay witness can describe facts that undermine an expert's analysis.

Portal.… There [are] no pre-defined criteria for routing the message"; instead, a message is "simply" sent to "the user to whom it is addressed." (Feb. 28, 2014 Hashmat Decl. ¶ 17). Armed with this type of information about how the CureMD system works, a juror can draw his or her own conclusion about whether a system that functions in that way infringes the '523 Patent.

Building on its contention that Bilal Hashmat's declarations constitute inadmissible expert reports, 523 IP also argues that they should be excluded as a sanction under Federal Rule of Civil Procedure 37, for violation of Rule 26(a) and (e) as previously undisclosed expert testimony. (Pl. Opp. 12-15).[31] This argument is mooted by the Court's finding that Bilal Hashmat's testimony is not expert testimony. In any event, both Hashmat brothers were disclosed as individuals likely to have discoverable information in CureMD's Rule 26 disclosures. (Apr. 25, 2014 Kelleher Decl. Ex. 17). Thus, 523 IP had ample time and opportunity to depose either or both brothers, and did in fact depose Kamal Hashmat on two separate occasions.[32]

---

[31]    Relying on the May 17, 2013 hearing transcript, 523 IP also claims that Judge Pauley, who previously presided over this case, "ordered that CureMD is prohibited from relying on any experts in this case." (Pl. Opp. 12). The portion of the transcript on which 523 IP presumably relies is more equivocal than 523 IP suggests. (*See* May 17 Tr. 7). However, the issue is mooted for now, inasmuch as the Court has not authorized the admission of defense expert testimony.

[32]    521 IP also argues that Exhibits B, E, F, and G of Bilal Hashmat's Feb. 28, 2014 declaration should be excluded as having been prepared by CureMD for this litigation, as inadmissible hearsay, and as impermissible expert testimony. 523 IP also argues that Exhibit G was not produced in discovery and should therefore be precluded. Exhibit B is a message (presumably an email) authored by the declarant himself; its contents are not being offered for the truth of the matter asserted therein, but to demonstrate when those contents were sent to 523 IP. It is permitted. Exhibits E, F, and G are demonstrative exhibits. They provide observations, facts, and information organized in particular ways and are not impermissible hearsay or expert testimony. Exhibits E and F were produced in discovery; Exhibit G was not. However, because all of these exhibits contain information already on the record, reorganized for

In accordance with these findings, the Bilal Hashmat declaration and the Kamal Hashmat depositions are not precluded.  However, to the extent that those declarations and transcripts state an opinion or conclusion that essentially usurps the role of the factfinder, those statements have not been considered by the Court and will be stricken from the document.[33]

### b.   The Conner Declaration Will Be Stricken

Conner faces the same challenges as the Hashmats: 523 IP argues that his declaration is expert testimony impermissible under Federal Rule of Evidence 701, and that it, along with its exhibits, should be excluded under Federal Rule of Civil Procedure Rule 37 for noncompliance with Rule 26.  (Pl. Opp. 15-19).

First, Conner's testimony is not expert testimony for the same reason that the Hashmat brothers' testimony was not: he started his company, developed the NetPractice Manager system, and can testify to his personal knowledge about that product.  But, like the Hashmat brothers, Conner proffers several lay opinions that impermissibly "usurp the fact-finding

---

demonstrative purposes, they are permitted.  Should this case go to trial, the issue of what demonstrative exhibits would be appropriate for use in front of a jury will be revisited at that time.

[33]   The Court does not here list the affected portions of the declarations and transcripts. At the summary judgment stage, the Court is perfectly capable of excluding these statements from its consideration, and the parties are on sufficient notice of what those excluded statements are.  These conclusory statements do not contain any substance, so CureMD is not prejudiced by not knowing the exact sentences to be excluded — CureMD can still rely on the permissible lay observations and factual assertions made in these declarations.  Moreover, perhaps understanding that it could not create or dispel material fact issues with lay witness opinion testimony, CureMD did not rely on these opinions in its moving and responsive papers.  Should these documents ever have occasion to come before a jury, the Court will address specific redactions at that time.

function of the jury." *Garcia*, 413 F.3d at 211.  For example, he states, "The screen captures and demonstration images of the NMS Portal shown in the claim chart disclose all seven (7) elements of Claim 31."  (Conner Decl. ¶ 26).  In this statement and others like it, Conner is similarly "telling the jury that he [has] concluded," *Garcia*, 413 F.3d at 210, that his system is the same as that disclosed in the '523 Patent.  Moreover, in making many of his conclusory observations, Conner is relying on 523 IP's implicit claim construction, not the one adopted by the Court.[34]  Several of those conclusions have now been vitiated by the Court's construction.

523 IP's arguments regarding CureMD's discovery violations are more persuasive with respect to Conner.  523 IP contends that, despite discovery requests seeking the information, CureMD never produced any documents relating to its alleged invalidity defense prior to the close of expert and fact discovery.  (Pl. Opp. 15).  Rather, CureMD waited until after the close of expert discovery to produce 400 pages of documents and additional electronic files that it apparently "admittedly had in its possession prior to the close of fact discovery."  (*Id.*).  CureMD never disclosed Conner as a witness, and never informed 523 IP that it would rely on testimony from Conner or any of those "late-produced documents" in support of its invalidity defense.  (*Id.* at 16).

---

[34]  For example, the claim chart to which Conner refers in paragraph 26 of his declaration is, in fact, a claim chart prepared by 523 IP.  523 IP attached the chart to correspondence in which it accused Conner's system of infringing the '523 Patent.  (Conner Decl. Ex. L).

Cure MD also never informed 523 IP that it would rely on the NetPractice Manager system as invalidating prior art.  (*Id*.).

In response, CureMD claims that 523 IP "has been aware of Mark Conner and the NetPractice product … [and] this 'black cloud' of invalidity looming over the '523 patent for years." (Def. Reply 13).  In support of this argument, CureMD points to correspondence between Conner and 523 IP that took place in 2011, in which 523 IP accused NetPractice of infringement and Conner responded that his product was invalidating prior art.  (*Id*.).  Within that correspondence, Conner provided to 523 IP a three-page affidavit attesting that his system embodied all the elements of the '523 Patent but had been developed and in use prior to Sameh's 2001 patent application.  (*Id*.; Conner Decl. Ex. P).  CureMD examined Sameh on this correspondence and affidavit in his May 30, 2013 deposition, and suggested then that CureMD *could* make the argument that this was prior art.  (Def. Reply 13; May 30, 2013 30(b)(6) Dep. 168-75).  Additionally, at some unspecified point during discovery, CureMD subpoenaed CompuGroup Medical, the successor to Noteworthy, for documents and electronic materials regarding the NetPractice system.  (Def. Reply 13).  CureMD argues that although it produced the documents responsive to the subpoena to 523 IP after the close of discovery, it was doing so in accordance with its obligation to supplement discovery requests under Rule 26, and that 523 IP was not "sandbagged."  (*Id.* at 13-14).

As noted, in determining whether the Rule 31 sanction of preclusion is warranted, the Court looks to the four *Design Strategy* factors: (i) the party's

explanation for its failure to disclose, (ii) the importance of the evidence, (iii) the prejudice suffered by the opposing party, and (iv) the possibility of a continuance. *Design Strategy*, 469 F.3d at 296. As to the first factor, CureMD provided no explanation for its failure to disclose. CureMD did not explain why it never added Conner to its list of witnesses with potentially discoverable information, and did not explain why it did not update its interrogatory responses to reflect its intention to use the NetPractice system as invalidating prior art. It does not even explain why it produced the documents responsive to the CompuGroup Medical subpoena after the close of discovery. CureMD also does not attempt to argue that its failure to disclose was "substantially justified." This complete lack of explanation thus weighs in favor of preclusion.

With regard to the second factor, the importance of the evidence: clearly, the validity of a patent is a fundamental inquiry, and there is a strong public interest in clearing away invalid patents through litigation. *See Rates Tech. Inc.* v. *Speakeasy, Inc.*, 685 F.3d 163, 167-70 (2d Cir. 2012), *cert. denied*, 133 S. Ct. 932 (2013). If CureMD were found to have infringed the '523 Patent, but upon a validity inquiry the patent were found invalid, such result would be dispositive in the instant litigation. But perhaps more importantly, the patent's subject matter would be removed from the realm of protected intellectual property, permitting public access and use, and preventing needless enforcement litigation. The importance of the invalidity inquiry therefore weighs against preclusion of this evidence.

65

The prejudice to 523 IP of CureMD's failure to disclose is significant. CureMD attempts to argue that the failure to disclose was harmless, asserting that 523 IP was on notice because Sameh was questioned about the correspondence with Conner regarding the NetPractice system.  But Sameh was confronted with *dozens* of letters and emails in his May 30, 2013 deposition, all regarding purported infringement of the '523 Patent, with multiple companies operating electronic medical systems.  For 523 IP to have identified Conner's correspondence from the pile as the basis for CureMD's invalidity defense requires a stretch of the imagination.  Under Rule 26, it was CureMD's obligation to identify evidence underlying its defenses and the witnesses who may possess such evidence.  It did not.  Discovery is now closed in this three-year-old litigation.  523 IP did not have the opportunity to depose Conner on the allegedly invalidating prior art or to seek its own discovery from CompuGroup Medical.  This factor weighs in favor of preclusion of this evidence.

Lastly, the Court considers the possibility of a continuance.  This case was filed in 2011.  Discovery closed in the fall of 2013; it is now the fall of 2014.  The Court strongly disfavors extensions of deadlines generally as inexpedient and wasting resources; to reopen discovery now, a year after it has closed, would seem to be an unjustified drain on the resources of the parties and the Court and weighs in favor of preclusion.

Three of the four *Design System* factors weigh in favor of preclusion.  The Court therefore excludes Conner's declaration and the accompanying exhibits

from its consideration on summary judgment under Federal Rule of Civil

Procedure Rule 37.  *See Underpinning & Found. Skanska, Inc.*, 726 F. Supp. 2d

at 349 (precluding undisclosed evidence where no explanation for failure

provided, discovery closed in three-year old litigation, opposing party did not

have opportunity to depose witness on evidence, and opposing party was

prejudiced).

**B.    Portions of Plaintiff's Expert's Testimony Will Be Excluded**

By its motion to exclude, CureMD has asked the Court to exclude the

portions of the report of 523 IP's expert, Joseph Sameh, that address literal

infringement of the '523 Patent under Federal Rules of Evidence 702 and 403,

and under the Supreme Court's decision in *Daubert* v. *Merrell Dow Pharm., Inc.*,

509 U.S. 579 (1993).  Here, too, the Court grants the motion in part and denies

it in part.

**1.    Background**

**a.    Sameh's Qualifications**

Sameh is the inventor of the '523 Patent.  Sameh states that he "studied

at Brooklyn Tech and at the State University of New York ('SUNY') at Bronx

Community College."  (Sameh Report ¶ 2).  On his resume, however, he only

lists his attendance at SUNY from 1969 to 1972.  (*Id.* at Ex. 1).  Sameh did not

receive a degree from either institution, nor has he since obtained an

associate's or bachelor's degree.  In 1991, Sameh obtained a "non-credit" (i.e.,

not part of a formal degree program) Certificate in Business Administration

("CBA") from the University of Illinois at Chicago, which he describes as "an eMBA program." (*Id.* at ¶ 2 & Ex. 1).

From 1968 to 1971, Sameh worked in the SUNY community college system, first at Queensborough Community College and then at Bronx Community College, where he "managed class registration programs for students and faculty." (Sameh Report ¶ 7).  In 1971, he joined the Fashion Institute of Technology as a "computer center operations manager," where he was responsible for "class registration, tuition accounts receivable, and grade reporting functions of the computer center," as well as "staff management, systems analysis, computer programming, and seamless migration of services from mainframe computers to mini computers." (*Id.*).  Sameh was also a "co-instructor in computer systems, assembly language, and COBOL." (*Id.* at Ex. 1).

From 1976 to 1985, Sameh worked for "various podiatry; dentistry; ear, nose, and throat; and ophthalmology practices." (Sameh Report Ex. 1).  At all of these practices, Sameh states that he served as the "business and medical practice manager." (*Id.*).  In his report, Sameh claims to have "co-founded" the Podiatry Group of New York in 1976 (*id.* at ¶ 8); his resume, however, claims only to have "[c]reated the branding for Podiatry Group of Greater New York" (*id.* at Ex. 1).[35]  Sameh was hired by Dr. Shavelson, who approached Sameh because he was, according to Sameh, "well known in [his] community for being

---

[35]     At his deposition, Sameh clarified that he "created the name Podiatry Group of Greater New York, which sounds a little better than Dr. Dennis Shavelson" (Apr. 25, 2013 Sameh Dep. 10-11).

a very creative person." (Apr. 25, 2013 Sameh Dep. 12).  At that practice,
Sameh says he "was responsible for interviewing doctors and staff, hiring them,
advertising, marketing, making sure everything was staffed.  Basically running
the business." (*Id.* at 11).  Sameh remained at that employer for approximately
one year.  (*Id.* at 12).

      From 1977 to 1985, Sameh worked for a dentist, an ear, nose and throat
doctor, and an ophthalmologist.  (Sameh Report ¶ 8 & Ex. 1).  The record is
silent as to how long Sameh was employed at each practice, his role at the
dentist and the ENT practices, or whether he was employed continually during
this time period.  Sameh apparently played a similar role at the last practice,
an ophthalmology practice, as he did at the first podiatry practice: he "ran" the
business.  (Apr. 25, 2013 Sameh Dep. 14).  He says of his role: "I supervised
the staff.  I developed operational processes.  I interviewed new staff members.
I evaluated the staff members.  I fired, if I had to.  I hired, if I had to.  I helped
the doctor grow the practice in one year from 700,000 to 1.4 million." (*Id.*).  By
1985, Sameh had "mutual[ly]" parted ways with the ophthalmologist because
that physician "was not capable of understanding that [Sameh] brought a lot to
the practice ... [and] wasn't willing to compensate [him] in a financial way." (*Id.*
at 14-15).

      In 1985, Sameh started two companies.  The first sold "high-end audio
and video systems and installed them into high-end homes." (Apr. 25, 2013
Sameh Dep. 16).  This work was unrelated to his work with medical practices.
(*Id.*).  That business lasted about a year.  (*Id.* at 18).  At about the same time,

Sameh started Teleconnect, a "telephone answering service providing 24-hour coverage to companies, doctors, people who needed the telephone answered by a human voice when they weren't in their office." (*Id.* at 19).  Within a year, that company had changed its name to MediConnect and sharpened its focus to medical clientele.  (*Id.*).  The services provided by MediConnect included "appointment scheduling ..., emergency and routine after hours call management, daytime and overflow call management, backup to hospitals when their systems failed, patient registration, and other data acquisition applications[.]" (Sameh Report ¶ 10).  Through his work with this company, Sameh gained experience and understanding of the concerns of patient and physician in their communications with each other (*see generally* Apr. 25, 2013 Sameh Dep. 24-28), although his day-to-day responsibilities were "primarily in sales" (*id.* at 43-44).

In 1990, Sameh founded PhoneScreen, a screening service for clinical trial patient recruitment.  (Sameh Report ¶ 18 & Ex. 1).  Sameh's day-to-day activities with this enterprise were also "primarily in sales."  (Apr. 25, 2013 Sameh Dep. 43-44).  During the time he worked at PhoneScreen, he also authored several articles related to patient recruitment in clinical drug trials.  (Sameh Report ¶¶ 19, 22, 25 & Ex. 1).  Sameh did not create the call processing systems used by MediConnect and PhoneScreen; and although he was in communications with an outside vendor, it was the vendor that actually conceived of and developed the software and scripts for the system.  (Apr. 25,

2013 Sameh Dep. 37-43).  Both MediConnect and PhoneScreen were acquired

by American Medical Alert Corporation in 2006.  (Sameh Report ¶¶ 17, 26).

Sameh was also part of a team within the Association of Telemessaging

Services International ("ASTI") that developed standard agreements in

compliance with HIPAA.  (Sameh Report ¶ 14).  Sameh claims to have been

selected to lead the team "due to [his] industry wide recognition as a thought

leader in the industry with a robust understanding of computers, an

understanding of the complexities of HIPAA patient privacy concerns, the

medical office practice work flow, and a vision of the future for the [telephone

answering service] industry."  (*Id.* at ¶ 16).

In 2002, the same year he filed the application for the '523 Patent,

Sameh founded NeedMyDoctor Company, which is a "stand alone patient

portal using the '523 [Patent] technology."  (Sameh Report ¶¶ 27-28).  Sameh

did not build the software used by NeedMyDoctor; rather, he "hired

programmers and they designed … and built the software to [his]

specifications."  (Apr. 25, 2013 Sameh Dep. 126).  In 2007, Sameh founded

Sameh Enterprises, Inc., which provides "[c]onsulting services to doctors,

hospitals and business."  (Sameh Report Ex. 1).

Sameh has authored "more than twenty-five technical and industry

opinion and vision articles" and "two textbook sections."  (Sameh Report ¶ 3).

Sameh lists 27 publications on his resume.  The majority of those articles are

on the subject of telephone answering services or patient recruiting for clinical

trials.  (*See id.* at Ex. 1).  Approximately eight appear to involve web messaging

systems.  (*Id.*).  Eleven of the articles, including all but one of the articles relating to web messaging systems, are self-published blog articles on Sameh's own website.  (*Id.*).

### b.    Sameh's Report

Sameh's report is divided into three substantive sections, bookended by an introduction and a short conclusion.  The "Qualifications" section provides an overview of his qualifications (Sameh Report ¶¶ 1-8); the "Background" section goes into more depth regarding both Sameh's employment experience and the environment in which he conceived of the '523 Patent (*id.* at ¶¶ 9-49); and the "'523 Patent" section describes the purpose of the patent and provides an element-by-element analysis of Sameh's opinion that the CureMD Patient Portal infringes the '523 Patent (*id.* at ¶¶ 50-89).  Sameh's analysis is not based upon any claim construction explicitly proffered by him or entered by the Court.  Instead, according to 523 IP, Sameh "implicitly construed the claims to have their plain and ordinary meaning."  (Pl. Excl. Opp. 9).

### 2.    Applicable Law[36]

The Supreme Court has tasked district courts with a "gatekeeping" role with respect to expert opinion testimony.  *Daubert*, 509 U.S. at 597 (holding that it is the district court's responsibility to ensure that an expert's testimony "both rests on a reliable foundation and is relevant to the task at hand").  This "gatekeeping" function applies whether the expert testimony is based on scientific, or on technical or "other specialized" knowledge.  *Kumho Tire Co.,*

---

[36]     See note 28, *supra*, regarding applicable law in patent cases.

*Ltd.* v. *Carmichael*, 526 U.S. 137, 141 (1999).  "It is well-established that the

trial judge has broad discretion in the matter of the admission or exclusion of

expert evidence[.]"  *Boucher* v. *United Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d

Cir. 1996) (citation and quotation marks omitted).

Federal Rule of Evidence 702 grants an expert witness testimonial

latitude unavailable to other witnesses, as follows:

> A witness who is qualified as an expert by knowledge,
> skill, experience, training, or education may testify in
> the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized
> knowledge will help the trier of fact to understand the
> evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and
> methods; and
>
> (d) the expert has reliably applied the principles and
> methods to the facts of the case.

Fed. R. Evid. 702.  A court's inquiry thus focuses on three issues: (i) whether

the witness is qualified to be an expert; (ii) whether the opinion is based upon

reliable data and methodology; and (iii) whether the expert's testimony on a

particular issue will assist the trier of fact.  *Nimely* v. *City of New York*, 414

F.3d 381, 396-97 (2d Cir. 2005).  "[T]he proponent of expert testimony has the

burden of establishing by a preponderance of the evidence that the

admissibility requirements of Rule 702 are satisfied[.]"  *United States* v.

*Williams*, 506 F.3d 151, 160 (2d Cir. 2007).

73

### a.    Qualifications of the Expert

Whether a purported expert witness is qualified is determined based upon his or her "knowledge, skill, experience, training or education," Fed. R. Evid. 702, and is a "threshold question" to be resolved prior to the other inquiries, *Nimely,* 414 F.3d at 396 n.11; *see also Zaremba* v. *Gen. Motors Corp.*, 360 F.3d 355, 360 (2d Cir. 2004) (finding that where expert witness lacks qualifications, an analysis of remaining factors "seems almost superfluous"; affirming district court's exclusion of expert testimony and granting of summary judgment).  When deciding whether an expert is qualified to render opinion testimony, the court must take into consideration the expert's "background and practical experience," *McCullock* v. *H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995), by looking at the "totality of the expert's qualifications," *Tiffany (NJ) Inc.* v. *eBay, Inc.*, 576 F. Supp. 2d 457, 458 (S.D.N.Y. 2007) (citation omitted).  A witness may be qualified based on any one or more of the qualities listed in Rule 702 — knowledge, skill, experience, training or education.  *See Tiffany (NJ) Inc.*, 576 F. Supp. 2d at 458.

The court must then "compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered testimony," *United States* v. *Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004), and ensure that the expert will actually be testifying "on issues or subject matter within his or her area of expertise," *Haimdas* v. *Haimdas*, No. 09 Civ. 02034 (ENV) (MDG), 2010 WL 652823, at *2 (E.D.N.Y. Feb. 22, 2010) (citing *Stagl* v. *Delta Air Lines, Inc.*, 117 F.3d 76, 80 (2d Cir. 1997)).  In other

words, "[a]n expert qualified in one subject matter does not thereby become an expert for all purposes.  Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702."  *Malletier* v. *Dooney & Bourke, Inc.*, 525 F. Supp. 2d 558, 642 (S.D.N.Y. 2007).  Courts in this Circuit have stricken extraneous testimony "where an expert is admitted under Rule 702 and then purports to offer opinions beyond the scope of his expertise, … as the admission of an expert does not provide that individual with *carte blanche* to opine on every issue in the case."  *Davis* v. *Carroll*, 937 F. Supp. 2d 390, 413 (S.D.N.Y. 2013) (striking those portions of expert's testimony beyond the scope of his expertise, and admitting others within scope); *see also Sundance, Inc.* v. *DeMonte Fabricating Ltd.*, 550 F.3d 1356 (Fed. Cir. 2008) (finding abuse of discretion where district court allowed expert "without any technical expertise [in the pertinent art] to testify on the issues of infringement and validity," and noting that such testimony "amounts to nothing more than advocacy from the witness stand").

Courts in this Circuit have liberally construed the qualification requirements of Rule 702, "at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience."  *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004); *see also United States* v. *Brown*, 776 F.2d 397, 400 (2d Cir. 1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the Rule"); *In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d 230, 282 (E.D.N.Y. 2007) ("In keeping with the 'liberal

thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion' testimony,' the standard for qualifying expert witnesses is liberal." (quoting *Daubert*, 509 U.S. at 588-89)).  However, an expert basing his opinion solely on his experience must do more than aver conclusorily that his experience led to his opinion: "[i]f the witness is relying solely or primarily on experience, then the witness must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts." *Pension Comm. of Univ. of Montreal Pension Plan* v. *Banc of Am. Secs., LLC*, 691 F. Supp. 2d 448, 473 n.148 (S.D.N.Y. 2010) (quoting Fed. R. Evid. 702 advisory committee's note).

### b.    Reliability of Expert Testimony

Once a court has determined that a witness is qualified as an expert, it must next ensure that the expert's testimony both "rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.[37]  In order to be admissible, "[a]n expert opinion requires some explanation as to how the expert came to his conclusion and what methodologies or evidence

---

[37]    In *Daubert*, the Supreme Court identified factors that may bear upon the reliability of proposed scientific testimony, including: (i) whether the theory or technique can be, and has been, tested; (ii) whether it has been subjected to peer review and publication; (iii) the known or potential error rate of the technique; (iv) the existence and maintenance of standards controlling the technique's operation; and (v) whether the technique or theory has gained widespread acceptance in the relevant scientific community.  *Daubert*, 509 U.S. at 593-94 (noting that these factors do not constitute "a definitive checklist or test").  In *Kumho*, the Supreme Court held that a court may apply the *Daubert* factors, as appropriate, in cases dealing with technical or "other specialized," but non-scientific, testimony.  526 U.S. at 141.

substantiate that conclusion." *Riegel* v. *Medtronic, Inc.*, 451 F.3d 104, 127 (2d Cir. 2006), *aff'd on other grounds*, 552 U.S. 312 (2008).

Rule 702 requires that "expert testimony rest on 'knowledge,' a term that 'connotes more than subjective belief or unsupported speculation.'" *Rezulin*, 309 F. Supp. 2d at 543 (quoting *Daubert*, 509 U.S. at 590); *see also In re Zyprexa Prods. Liab. Litig.*, 489 F. Supp. 2d at 284 (finding that "[s]ubjective methodology, as well as testimony that is insufficiently connected to the facts of the case," can serve as "grounds for rejection of expert testimony").  "[A] trial judge should exclude expert testimony if it is speculative or conjectural or based on assumptions that are so unrealistic and contradictory as to suggest bad faith." *Zerega Ave. Realty Corp.* v. *Hornbeck Offshore Transp.*, LLC, 571 F.3d 206, 213-14 (2d Cir. 2009) (citation and quotation marks omitted). "[O]ther contentions that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* (alteration in original) (citation omitted).  "A minor flaw in an expert's reasoning or a slight modification of an otherwise reliable method" does not itself require exclusion; exclusion is only warranted "if the flaw is large enough that the expert lacks good grounds for his or her conclusions." *Amorgianos* v. *Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 267 (2d Cir. 2002) (citation and quotation marks omitted).  This is because "our adversary system provides the necessary tools for challenging reliable, albeit debatable, expert testimony." *Id.*  "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of

proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (quoting *Daubert*, 509 U.S. at 596).

While a district court has "broad latitude" in deciding both "how to determine reliability" and in reaching "its ultimate reliability determination," it may not abandon its "gatekeeping function." *Williams*, 506 F.3d at 160-61 (citation omitted). "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire*, 526 U.S. at 157 (citation omitted). Thus, "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Ruggiero* v. *Warner-Lambert Co.*, 424 F.3d 249, 255 (2d Cir. 2005) (citation omitted).

### c.   Helpfulness or Relevance of Testimony

Finally, the Court must determine whether the proposed expert testimony "will help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702. This inquiry looks primarily to whether the testimony is relevant. *See In re Zyprexa*, 489 F. Supp. 2d at 283. Under the Federal Rules of Evidence, evidence is relevant if it has a "tendency to make a fact more or less probable than it would be without the evidence." Fed. R. Evid. 401; *see also Daubert*, 509 U.S. at 591-92 ("Rule 702's 'helpfulness' standard requires a valid scientific connection to the pertinent inquiry as a precondition to admissibility.").

A court should not admit expert testimony that is "'directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help.'" *United States* v. *Mulder*, 273 F.3d 91, 104 (2d Cir. 2001) (quoting *United States* v. *Castillo*, 924 F.2d 1227, 1232 (2d Cir. 1991)); *see also Atlantic Specialty Ins.* v. *AE Outfitters Retail Co.*, 970 F. Supp. 2d 278, 291-92 (S.D.N.Y. 2013) (excluding expert's "opinion on the extent of fire damage resulting from [fire department's] response time," where expert's opinion was essentially "a fire causes increasing damage the longer it burns," because "a lay person is entirely capable of reaching this conclusion without the help of an expert").

Expert testimony must also adhere to the other Federal Rules of Evidence, including Rule 403, which provides that relevant evidence may still be excluded "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403. The Rule 403 inquiry is particularly important in the context of expert testimony, "given the unique weight such evidence may have in a jury's deliberations." *Nimely*, 414 F.3d at 397; *see also Daubert*, 509 U.S. at 595 ("'Expert evidence can be both powerful and quite misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.'"

79

(quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991))).

### 3.   Analysis

#### a.   Sameh's Expert Testimony Outside the Field of Doctor-Patient Communication Is Stricken

The first challenge Sameh faces is the "threshold question," *Nimely,* 414 F.3d at 396 n.11, of whether he is qualified as an expert by his "knowledge, skill, experience, training or education," Fed. R. Evid. 702.  CureMD argues that Sameh is not qualified to opine on patent infringement issues because he does not have the requisite education, training, or skills, and is not an expert in "software engineering of telecommunication systems."  (Def. Excl. Br. 4). 523 IP counters that Sameh is qualified by his "experience in the field of doctor-patient communication and medical practice management," which experience "enables him to fully understand the space in which the '523 Patent technology operates."  (Pl. Excl. Opp. 5, 7-8).[38]  Both arguments have some merit: based on his experience, Sameh has general expertise in the field of the '523 Patent, which is "doctor-patient communications," but he has not demonstrated the knowledge, skill, experience, training, or education to qualify as an expert in related fields including software engineering, computer programming, or systems engineering.

---

[38]     523 IP also argues that this Court should deny CureMD's motion to exclude in its entirety as untimely.  (Pl. Excl. Opp. 3-4).  While the Court agrees with 523 IP that the motion was untimely, and as a general rule has little tolerance for disregard of its rules and scheduling orders, the Court declines to exercise its discretion to reject the motion on a technicality.   523 IP has not alleged any prejudice from the filing four days after the summary judgment motions were fully briefed, nor could it: 523 IP had a full and fair opportunity to respond.

Sameh himself characterizes his "area of specialization" as "patient-to-provider communications." (May 30, 2013 Sameh Dep. 35). As 523 IP points out, for over three decades, despite little formal education, he has been solving problems "in the field of doctor-patient communication and medical practice management." (Pl. Excl. Opp. 5). Sameh spent nearly a decade working on the business side of medical practices. Starting in 1985, he immersed himself in the field of patient-to-physician communication with his telephone answering service company MediConnect and his clinical trials recruiting service company PhoneScreen. He has authored several publications in trade magazines on the subject, as well as a section in a textbook. He developed the instant patented invention in order to facilitate doctor-patient communications (May 30, 2013 Sameh Dep. 35); the Specification even describes "field of the invention" as "physician/patient contact and more particularly to methods of forwarding messages from a patient to a physician" ('523 Patent col.1 l.5-7). Indeed, CureMD does not dispute Sameh's experience or expertise in this particular field. (Def. Excl. Reply 3 ("It is undisputed that Mr. Sameh has been a successful businessman in founding and operating a number of businesses involving management of medical offices and doctor/patient communications. CureMD does not seek to denigrate Mr. Sameh's experience.")).

What CureMD contests is that Sameh's experience qualifies him to testify as to how a CureMD *software* product infringes his patent. (Def. Excl. Reply 3). In its opposition papers, 523 IP does not argue that Sameh has specialized knowledge that qualifies him as an expert in software engineering,

computer programming, systems engineering, or similar fields — nor could it. Instead, 523 IP contends that Sameh "is intimately familiar with the technology of the '523 Patent" (Pl. Excl. Opp. 5); is qualified "to provide helpful testimony to the jury on the technology of the '523 Patent and on CureMD's infringement" (*id.*); "fully understand[s] the space in which the '523 Patent operates" (*id.* at 7-8); and "has a wealth of technical experience in this matter" (*id.* at 8).

These vague proclamations of "technical" expertise are insufficient to establish any "specialized knowledge," particularly because they are unsupported by Sameh's actual qualifications.  Just because Sameh came up with the idea for an apparatus that performs the actions outlined in the '523 Patent does not automatically make him an expert in the technologies available to effectuate that apparatus.  (*See, e.g.*, May 30, 2013 30(b)(6) Sameh Dep. 27 (Sameh distinguishing the apparatus from its implementation: "Q: Do you regard [the '523 Patent] as being a software patent?  A: … [I]t's a method and an apparatus patent that could be managed with software.")).  Indeed, when it came to actually implementing the apparatus described in the '523 Patent for his company NeedMyDoctor, Sameh did not do it himself.  Instead, he "hired programmers and they designed … and built the software to [his] specifications."  (Apr. 25, 2013 Sameh Dep. 126).

In response, 523 IP points to Sameh's limited training in computer programming.  It is not enough.[39]  In his report, Sameh claims, "Computer

---

[39]    CureMD asks this Court to adopt a standard that in order "to qualify as an expert skilled in the art to testify on infringement of the '523 patent, the expert should have [i] a bachelor's degree in computer science, computer engineering or electrical

programming and applications expertise, including other computer knowledge was learned both through courses as well as self taught." (Sameh Report ¶ 2). Sameh began studying "systems analysis and computer programming" in community college in the early 1970s (Apr. 25, 2013 Sameh Dep. 8), but he did not graduate, has not since pursued further education in the subject,[40] and has provided no specifics about any course he took. Sameh was also, apparently, a "co-instructor in computer systems, assembly language, and COBOL" at one of the community colleges where he worked in the 1970s after dropping out as a student. (Sameh Report Ex. 1). But he does not specify at which institution he was a "co-instructor," indicate whether he was formally employed in that capacity or was moonlighting, or identify who his pupils were (students of the community college, other staff, volunteers, friends, etc.). In any event, any course taken or taught over 40 years ago cannot establish present expertise, particularly in such a rapidly developing field as computer programming. *See, e.g.*, *Malletier*, 525 F. Supp. 2d at 664 (finding that where an expert's "asserted ability was based on studying statistics in graduate

---

engineering, or equivalent experience and [ii] at least two years of experience designing and/or developing user interfaces for interactive communications systems between a sender and receiver." (Def. Excl. Reply 3). CureMD cites no legal or record support for such a standard, nor could it. In light of the "liberal thrust" of the Federal Rules in relaxing barriers to opinion testimony, *Daubert*, 509 U.S. at 588, it would be inappropriate to require Sameh to satisfy such an "overly narrow test." *See Arista Records LLC* v. *Lime Group LLC*, No. 06 Civ. 5936 (KMW), 2011 WL 1674796, at *3 (S.D.N.Y. May 2, 2011). As a practical matter, the Court notes that arbitrarily rigid standards like those proposed by CureMD would exclude individuals like Bill Gates and Mark Zuckerberg — neither finished college, but both undoubtedly possess some expertise in their respective fields.

[40]   Sameh did not take any courses on computer programming in obtaining his Certificate of Business Administration from the University of Illinois in 1990-91. (May 30, 2013 30(b)(6) Sameh Dep. 28).

school 30 years earlier, ... no good faith argument can be made that 30 year-old course study is a sufficient qualification to testify as a statistician" (citing *Andrews* v. *Metro N. Commuter R.R.*, 882 F.2d 705 (2d Cir. 1989) (finding expert not qualified by a few experiences relevant to the subject matter))).

Moreover, 523 IP fails to elaborate how or what Sameh "self-taught" in order to gain expertise in "computer programming and applications expertise, including other computer knowledge."[41]  Sameh and 523 IP are essentially asking the Court to accept his representation that he has expertise based on experience,[42] without explaining what that experience is or how his expertise grew from it.  And nowhere does Sameh "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts."  *Pension Comm. of Univ. of Montreal Pension Plan*, 691 F. Supp. 2d at 473 n.148.  As CureMD points out, "there is no link between Mr. Sameh's education/work experience and his qualification to render an [expert] opinion that the Patient Portal [software] product infringes claim 31."  (Def. Excl. Reply Br. 4).

---

[41]     In his deposition, not cited by 523 IP, Sameh provided an example of his "self-teaching": he taught himself how to use an Apple program called "FileMaker Pro" by "[r]eading manuals, practicing, and when [he] gets stuck [] research[ing] where [he is] stuck." (May 30, 2013 30(b)(6) Sameh Dep. 29).  Needless to say, teaching oneself to use a single program does not establish broader expertise, and 523 IP does not argue that it does.

[42]     For example, Sameh reaches a conclusion "[b]ased on a reasonable degree of software engineering certainty" (Sameh Report ¶ 59), without ever explaining his purported "software engineering" expertise beyond his perfunctory statement that "[c]omputer programming and other applications expertise, including other computer knowledge, was learned both through courses as well as self taught" (*id.* at ¶ 2).

The Court therefore finds that Sameh is qualified, based on his experience, to testify to matters and opinions that involve the field of doctor-patient communications.  This would include, for example, testimony on strategies to increase the effectiveness of doctor-patient communications, the concerns of the doctor and of the patient when communicating, the history of doctor-patient communications and the current state of the art, and identifying the typical means by which such communication occurs.  But, based on a review of his education and experience, the Court finds that Sameh is not qualified to testify as an expert in the fields of computer programming, systems analysis or engineering, "applications expertise," or "software engineering."[43] Therefore all portions of his report touching on areas outside his field of expertise are stricken; the Court will not rely on those portions in coming to a decision on any summary judgment motion and Sameh will not be permitted to offer such testimony at trial.  *See Davis*, 937 F. Supp. 2d at 413-20 (striking those portions of expert's testimony beyond the scope of his expertise, and admitting others within the scope); *Malletier*, 525 F. Supp. 2d at 642 ("Testimony on subject matters unrelated to the witness's area of expertise is prohibited by Rule 702."). [44]

---

[43]    Or physics, despite Sameh's attempt at one point in his report to opine on the behavior of subatomic particles.  (*See* Sameh Report ¶ 59 ("Some electrons are sent and delivered to the recipient.")).

[44]    Unlike the lay opinions of the Hashmats, which are easily extractable from their testimony without affecting their fact testimony, the admissible opinions of Sameh may not be so easily discerned from the inadmissible ones.  For notice purposes, the Court will therefore identify precisely the exclusions.  The portions of Sameh's report stricken under this finding are: paragraphs 58-59 and accompanying Figure 1; paragraph 69; paragraph 70, except for the last sentence; the last sentence of paragraph 72; the

### b.   Sameh's Testimony on Infringement Is Stricken as Unreliable and Irrelevant

The next challenge to Sameh's testimony is that it is unreliable.  In this regard, CureMD argues that Sameh's methodology is unreliable because Sameh does not follow the two-step analysis that courts are required to apply in determining patent infringement, namely, claim construction and then a comparison of the construed patent to the accused product.  (*See* Def. Excl. Br. 6-8; Def. Excl. Reply 4-6).  CureMD contends that Sameh "has not proffered a construction of the disputed claim terms" and therefore his methodology is flawed.  (Def. Excl. Br. 7).  523 IP retorts that Sameh "implicitly construed the claims to have their plain and ordinary meaning, and, using that construction, compared Claim 31 to the accused system."  (Pl. Excl. Opp. 9).

Both parties miss the point.  Claim construction is not for an expert to determine; it is a matter of law for the Court to decide.  *See Markman*, 517 U.S. at 391.  And CureMD acknowledges that Sameh does, as 523 IP contends, "implicitly" construe the claims when it bemoans that "Mr. Sameh has placed his own 'spin' on the facts in contradiction of the intrinsic evidence to make the evidence presented in [his] claim charts [] fit his predetermined outcome of infringement."  (Def. Excl. Br. 8).  The two-step infringement analysis is a methodology for courts, not for experts.  The problem with Sameh's conclusions is not that they do not follow the two-step analysis, but rather that they are unhelpful.

---

fourth sentence of paragraph 74; paragraph 78, except for the first two sentences; paragraph 79; and the third sentence of paragraph 85.

First, as previously noted, most of Sameh's conclusions are simply implicit arguments about what claim construction should be, and are therefore irrelevant advocacy rather than helpful expert testimony.  As but one example, Sameh concludes that CureMD's Patient Portal infringes the "plurality of message destinations" limitation of Claim 31, because a requestor seeking to send a message is provided with "a list of practice staff along with their roles within the practice [and] there is 'a plurality of message destinations provided by the physician.'"  (Sameh Report ¶ 73).  In effect, what Sameh has done is to construct the following syllogism:

· This limitation of Claim 31 should be construed such that "a list of practice staff along with their roles within the practice" falls within the meaning of "a plurality of message destinations provided by the physician."

· CureMD's Patient Portal has "a list of practice staff along with their roles within the practice."

· CureMD's Patient Portal infringes the '523 Patent.

Nearly all of Sameh's conclusions reads this way: they argue implicitly that the claim should be construed *so that* CureMD's Patient Portal infringes.

As discussed above, in patent claim construction, the Court only resorts to extrinsic evidence of this type if the claim remains ambiguous after consideration of intrinsic evidence.  *See Vitronics Corp.,* 90 F.3d at 1583.  In this case, the Court found that Claim 31 was adequately construed in light of the intrinsic evidence and that it need not reach extrinsic evidence.  But even if the Court had looked to expert testimony to aid its construction, "an inventor's self-serving statements are rarely relevant to the proper construction of a claim

term." *See O2 Micro Int'l Ltd.*, 521 F.3d at 1362 n.3.[45]  Sameh's conclusory, self-serving statements were not helpful to the Court in construing the claims, and they are now mooted by the Court's determined claim construction.  To the extent Sameh proffers opinions that are something more than disguised claim construction arguments, those opinions too are now irrelevant or unreliable, as they rely on a claim construction other than the Court's.  *See Medisim Ltd.* v. *BestMed LLC*, 861 F. Supp. 2d 158, 171 (S.D.N.Y. 2012) (finding expert testimony that failed to apply court's claim construction inadmissible as lacking reliable foundation).

CureMD is closer to the mark with its argument that Sameh's conclusions on infringement are "mere *ipse dixit*" assertions that should be excluded.  (Def. Excl. Reply 5).  Sameh's assertions are so conclusory and obvious as to be unhelpful to the trier of fact.  *See Mulder*, 273 F.3d at 104 (holding that a court should not admit expert testimony that is "directed solely to lay matters which a jury is capable of understanding and deciding without the expert's help").  For example, Sameh states that because within Patient Portal one can see "the image of a standard message form as it appears in Figure 9[,] … [this] is verification of 'a form downloaded by the requestor from

---

[45]     CureMD argues that, because he is the inventor of the '523 Patent, Sameh's financial stake in the outcome of the litigation means his opinion on infringement is self-interested and therefore unfairly prejudicial under Federal Rule of Evidence 403.  (Def. Excl. Br. 8-9).  These arguments are misplaced: while, as discussed above, an inventor's self-serving testimony is rarely substantively relevant to claim construction, inventors can and do testify to other issues in patent infringement cases.  *See, e.g.*, *Symbol Technologies, Inc.* v. *Opticon, Inc.*, 935 F.2d 1569, 1574 (Fed. Cir. 1991).  CureMD's bias arguments therefore go to the weight, not the admissibility, of Sameh's testimony.

the web site.'" (Sameh Report ¶ 78). Put simply, a form is a form. If the facts were to support such a conclusion, then a jury could easily make this determination without Sameh providing it to them in the guise of expert testimony.[46]

Unsupported assertions like these are not only impermissible as expert testimony under the law of the Second Circuit, but they are also irrelevant to the resolution of patent infringement issues under the law of the Federal Circuit. For example, in *Arthur A. Collins, Inc.* v. *N. Telecom Ltd.*, the Federal Circuit determined that an expert's conclusory statement was not sufficient to create a material fact to avoid summary judgment:

> Dr. Helgert's statement that the "so-called JNet is a TST switch" is nothing more than an unsupported assertion that the accused device contains a critical claim limitation and clearly would be insufficient, standing alone, to create a genuine issue of material fact. Dr. Helgert did not support his assertion that "JNet is a TST switch" with an explanation of why JNET's structure renders it a TST switch in his view; *i.e.*, there is nothing in his declaration that would allow a finder of fact to conclude that JNET constitutes a TST switch as that term is used in the patent. Dr. Helgert's unelaborated reference to Exhibit I … adds nothing of substance to his assertion.

---

[46]    As yet another example of an unsupported, conclusory opinion, Sameh claims that since when a patient sends a particular message form, e.g., a billing request, it goes to the inbox for that type of request, "the message information content has been determined and each message has been assigned to a particular [inbox] …, meeting the conditions of this claim element ['a content processor adapted to determine an information content…']." (Sameh Report ¶ 83). Sameh uses the passive voice ("the message information content has been determined") and provides no evidence — whether factual, technical, or otherwise — that it is a content processor as contemplated by the '523 Patent that is doing the "determining." He simply assumes, without basis or explanation, that because a billing request goes to a billing inbox, this setup implicates the use of a "content processor."

216 F.3d 1042, 1046 (Fed. Cir. 2000).  Similarly, Sameh's unsupported

assertions — made without explanation or elaboration that would allow a fact

finder to follow his reasoning and come to the same conclusion — have no

impact on the Court's resolution of this case on summary judgment.

Thus, the Court finds that Sameh's opinions and conclusions purporting

to opine on infringement are conclusory, irrelevant, and unreliable.

Accordingly, that portion of his testimony contained in his report shall be

stricken.[47]

## CONCLUSION

For the foregoing reasons, 523 IP's application for the exclusion of

witness testimony and other evidence is GRANTED in part and DENIED in

part, and CureMD's motion for the exclusion of portions of Sameh's testimony

is GRANTED.

The disputed terms of Claim 31 are hereby construed as set forth above.

The Court recognizes that its claim construction renders moot many of the

parties' arguments on summary judgment, and indeed may make the parties

reconsider the propriety of summary judgment at all.  Additionally, the Court's

rulings on the parties' applications for the exclusion of testimony and evidence

---

[47]   The portions of Sameh's report stricken under this finding are: paragraph 57; paragraph 61; paragraphs 64-90; and Exhibit 4, which consists of nothing more than Sameh's conclusory opinions in chart form.  The remainder of the report will remain intact for, as CureMD noted (Def. Excl. Br. 9), it may be helpful to the Court in understanding the context and subject matter of the '523 Patent.  *See, e.g.*, *Voice Techs. Group, Inc.* v. *VMC Sys., Inc.*, 164 F.3d 605, 615-16 (Fed. Cir. 1999) (stating that the inventor may provide testimony explaining the claimed invention and its development, but that "the inventor can not by later testimony change the invention and the claims from their meaning at the time the patent was drafted and granted").

significantly change the landscape of admissible evidence available for consideration.

Given the significance of the Court's findings on claim construction and the exclusion of evidence, the parties' respective summary judgment motions are DENIED without prejudice to refiling.  Plaintiff's May 16, 2014 letter application for oral argument on summary judgment (Dkt. #80) is likewise DENIED without prejudice to refiling.  The parties are hereby ORDERED to appear for a conference before the undersigned on **October 23, 2014, at 3:45 p.m.** in Courtroom 618 of the Thurgood Marshall Courthouse, 40 Foley Square, New York, New York.  At that conference, the parties shall inform the Court whether they intend to refile summary judgment briefing, and the Court will set a schedule either for further summary judgment briefing or for trial.

The Clerk of Court is respectfully directed to terminate the motions pending at Docket Entries 50, 55, 80, and 81.

SO ORDERED.

Dated:      September 24, 2014
            New York, New York

_____
     KATHERINE POLK FAILLA
     United States District Judge